HENRY M. OSWALD *vs.* MARY C. OSWALD.

*Annulment of Marriage—Misrepresentation—Concealment of Divorce.*

A marriage may be annulled by a court of equity when procured by abduction, terror, fraud, or duress, or when the fraud complained of relates to essential matters affecting the health or well-being of the parties themselves.              p. 316

That plaintiff was induced to marry defendant by the latter's statement that her former husband was dead, while he was in

fact living, though divorced from her, is not cause for annul-
ling the marriage, though plaintiff belongs to a church which
regards a marriage to which a divorced person is a party as
invalid.                                        pp. 316-318

*Decided July 1st, 1924.*

Appeal from the Circuit Court for Prince George's Coun-
ty, In Equity (BEALL, J.).

Bill by Henry M. Oswald against Mary C. Oswald. From
an order sustaining defendant's demurrer and dismissing
the bill, plaintiff appeals. Affirmed.

The cause was argued before PATTISON, URNER, OFFUTT,
DIGGES, and BOND, JJ.

*John F. Lillard,* for the appellant.

*S. Marvin Peach,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appeal in this case is from a decree sustaining the
demurrer and dismissing the bill filed by the appellant,
Henry M. Oswald, against the appellee, Mary C. Oswald,
asking for the annulment of the marriage between them,
solemnized on the 12th day of July, 1913, at Cleveland, Ohio.

The bill alleges that the appellee, prior to the time of her
marriage to the appellant, represented to him that she had
been previously married but that her husband was then
dead; that believing such representation to be true, and
relying upon it, he agreed to marry and did marry the
appellee, the marriage services being performed by a priest
of the Roman Catholic Church. That after the marriage
they lived together as man and wife until 1922, when he
learned that her former husband was still living; that as
soon as he learned of this fact, he confronted the appellant
with it and she then admitted that her former husband was
still alive and that she had made a misrepresentation in

saying to him that he was dead, although she at the time told him she had been divorced from her husband, and this fact was shown to be true by a copy of a decree divorcing them, filed as an exhibit with the bill.

The bill further alleges that, upon learning that her former husband was not dead but still alive, he told her that the Roman Catholic Church, of which he was a devout member, did not recognize their marriage as valid, a fact which she already knew; whereupon the appellee left him and has not lived with him since.

It is further alleged in the bill that the representations so made by the appellee were not only false but she knew them to be false when made, that they were made for the purpose of his acting upon them, that he believed them to be true and acted thereon in good faith to his great detriment, in that he is denied the full privilege of his church and has suffered in mind and body, because of such marriage contract in which he was induced to enter because of the misrepresentations of the appellee. Although the appellee's former husband was not dead at the time of her marriage to the appellant, she, as a result of her divorce from her former husband, could at such time enter into a valid contract of marriage; therefore, if her marriage to the appellant is to be held invalid, it must be so held because of the misrepresentations made by her to him.

While marriage is a civil contract, it is, as said by *Story, Conflict of Laws,* paragraph 108 n., "something more than a mere contract. It is rather to be deemed an institution of society, founded upon the consent and contract of the parties, and in this view it has some peculiarities in its nature, character, operation and extent of obligation, different from what belong to ordinary contracts." In *Brown* v. *Scott,* 140 Md. 266, the same idea is expressed. Judge Offutt, speaking for the Court in that case, said: "In contracts of marriage there is an interest involved above and beyond that of the immediate parties. Public policy requires that marriage should not be lightly set aside."

A marriage may be annulled by a court of equity in this State when it is procured by abduction, terror, fraud or duress, or when the fraud complained of relates to essential matters affecting the health or well being of the parties themselves. *Brown* v. *Scott, supra,* and *LeBrun* v. *LeBrun,* 55 Md. 496. But in many of these cases the difficulty is in determining when the representations made or the acts charged amount to fraud which may authorize the courts to decree the annulment.

In *Brown* v. *Scott,* a number of cases are referred to, showing the determination of the courts upon the facts in each of those cases, but in none of them are the facts altogether similar to those in this case.

In 9 *Ruling Case Law,* sec. 70, it is said a "concealment of a prior marriage which has been dissolved by death of or divorce from the first spouse is not considered such fraud as will invalidate or affect the second marriage." See cases cited thereunder.

But the case which is in all respects like the one before us is *Wells* v. *Talham,* 180 Wis. 654. In that case the plaintiff, a man seventy years of age, a member of the Roman Catholic Church, married a woman of the age of sixty-four, and, as in this case, no children were born of the marriage.

The husband filed his bill, asking for the annulment of the marriage, alleging therein that the defendant, for the purpose of inducing him to marry her, falsely and fraudulently represented to him that she was a widow, and falsely and fraudulently concealed from him the fact that she had been divorced and that her divorced husband was then living; that he did not know that the defendant was a divorced woman whose former husband was living: that he relied upon the representations made by her which induced him to marry her, and after the marriage, when he learned of the falsity of said representations made by her, he conferred with the Roman Catholic priest of his parish and was told by him that he must repudiate the marriage and separate from defendant, or suffer excommunication from his church.

Md.]                    Opinion of the Court.

Whereupon he separated from her and had not since cohabitated with her. In that case the court said:

"* * * although marriage is purely a civil contract, false representations which would set aside ordinary civil contracts are not necessarily sufficient to void the contract of marriage. This policy depends not alone on the vital importance of the dissolution of the marriage relation to the parties directly concerned. It rests on the deep concern of the state that the integrity of the marriage contract shall, so far as possible, be preserved. * * *

"It is not claimed by counsel for plaintiff that as a general rule false representations that a party to a marriage has never been divorced constitute such fraud as will justify a decree nullifying the marriage contract. Such a fraud does not go to the essence of the contract. *Donnelly* v. *Strong,* 175 Mass. 157, 55 N. E. 892; *Trask* v. *Trask,* 114 Me. 60, 95 Atl. 352; *Davis* v. *Whitlock,* 90 S. C. 233, 73 S. E. 171, 176, Ann. Cas. 1913D, 538. The discovery by the party deceived might bring mental distress, but a divorce does not prevent entering into a new marriage relation or the performance of all its duties.

"Counsel for respondent earnestly argues that owing to the age and the religious faith of decedent (who died while the proceedings were pending) and the canons of his church, the false representations did go to the very essentials of the marriage contract; that the marital relation under the facts stated in the complaint could only result in unhappiness to at least one of the contracting parties. This presents a new phase in actions to nullify the marriage contract, and no case from any court of last resort seems to have passed upon it. However, in *Boehs* v. *Hanger,* 69 N. J. Eq. 10, 59 Atl. 904, a somewhat similar situation was presented, and the plaintiff was denied relief. The question is raised whether members of one church can succeed in nullifying a marriage upon false representations when the same representations would afford no cause of action to members of other churches. We are not inclined to give our sanction to such a proposition.

"There is no allegation in the complaint from which it can be inferred that the defendant is not able and willing to perform all the duties of the marriage contract, and we must hold that it appears on the face of the complaint that the essentials of the marriage contract, as construed by the great weight of authority, were complied with. It follows that the demurrer should have been sustained."

In that case the court reversed the order of the lower court overruling the demurrer to the bill.

The facts of that case are identical with the facts of this case and, as the court's reasoning therein appears to us to be sound and convincing, we will not further prolong this opinion, but will affirm the order appealed from, sustaining the demurrer and dismissing the bill.

> *Order appealed from affirmed, with costs to the appellee.*