[Civ. No. 14578. Second Dist., Div. Three. Oct. 31, 1945.]

AMIEL R. SCHAUB, Plaintiff; SECURITY-FIRST NATIONAL BANK OF LOS ANGELES, as Administrator, etc. (Substituted Plaintiff), Respondent, v. ELLEN SCHAUB, Appellant.

Lawrence Paul Scherb for Appellant.

W. Blair Gibbens for Respondent.

THE COURT.—Plaintiff Amiel R. Schaub obtained a judgment annulling a marriage contract between himself and Ellen Schaub and annulling a deed whereby he conveyed real property to himself and Ellen Schaub as joint tenants. After this appeal was taken, Amiel R. Schaub died and the Security-First National Bank, the administrator of his estate, was substituted as plaintiff. He will be referred to herein as the plaintiff. Defendant Scott was named as corespondent in a cause of action for divorce. Defendant Ellen Schaub has appealed from the judgment. She will be referred to herein as the defendant.

Plaintiff and defendant were married on July 8, 1941, and at that time he was 60 years of age and she was 34 years of age. The first cause of action alleged that defendant, for the purpose of inducing the plaintiff to consent to said marriage and for the purpose of obtaining his property, falsely represented to plaintiff that she would be a good and faithful wife and would fulfill all the obligations of a wife; that at the time of making said representations she had no intention of fulfilling them; that she was not at any time a good or faithful wife, but immediately before the marriage she, without plaintiff's knowledge, entered into a conspiracy and a fraudulent scheme with defendant Scott by which it was agreed as follows: that she should enter into the marriage contract with

plaintiff with the intent that she would not consummate said marriage, that she would falsely represent to plaintiff that she would fulfill all the obligations of a wife, that after said marriage she and Scott would continue their sexual relations which had existed for some time prior to the conspiracy, and through the fraudulent scheme she would obtain from plaintiff the title to certain real property in joint tenancy; that in furtherance of said scheme she entered into the marriage contract with plaintiff with the intent that she would not consummate the marriage and with the secret intention not to fulfill all the obligations of a wife; that after the said marriage she and Scott did continue their sexual relations from the date of the marriage to and including May 1, 1943, and that plaintiff relying upon her promise to be a good and faithful wife did on August 13, 1941, execute a deed conveying certain described real property to himself and her as joint tenants; that at the time she made said false representations she knew plaintiff would and did rely upon them, and he was induced thereby to consent to said marriage; that if said representations had not been made to him or if he had had knowledge of said conspiracy and fraudulent scheme he would not have consented to said marriage; and that immediately upon discovering the conspiracy and the falsity of said representations on May 1, 1943, he ceased to cohabit with her.

The second cause of action included the allegations of the first cause of action and in addition thereto alleged that at the time she made said false representations she knew plaintiff would and did rely upon them, and he was induced thereby to execute said deed; that if said representations had not been made to him or if he had had knowledge of said conspiracy and fraudulent scheme he would not have executed said deed; and that he did not discover the conspiracy and fraudulent scheme and the falsity of the representations until May 1, 1943.

The third cause of action was for divorce upon the ground of cruelty. The fourth cause of action was for divorce upon the ground that defendant committed adultery with Scott.

Defendant denied the above mentioned allegations of the complaint, and filed a cross-complaint for divorce upon the ground of cruelty. Plaintiff denied the allegations of the cross-complaint as to cruelty.

The court found that the above mentioned allegations of the complaint were true, and also found that there was no com-

munity property and no "joint property" of the plaintiff and defendant.

Defendant contends that the evidence does not support the findings or judgment. Her argument is that there was no direct evidence that she said she would be a good and faithful wife and would fulfill all the obligations of a wife; that, although such representations are made impliedly when a woman accepts a proposal to marry, there was no evidence that such representations were false or made for the purpose of obtaining plaintiff's property or that they were made with the intention of not fulfilling them; that the mere fact that a year after the marriage the defendant fell from wifely virtue does not support inferences that she made such representations, as set forth in the findings, or any representations, for the purpose of inducing plaintiff to consent to the marriage or for the purpose of obtaining his property; that the evidence showed that she was a very satisfactory wife for a year, and therefore the findings should have been the opposite of the findings which were made; and that the finding that she would not consummate the marriage is without evidentiary support since both parties testified that the marriage was consummated.

Defendant testified that she and plaintiff were married on July 8, 1941, and they lived together until May 1, 1943; that on May 1, 1943, defendant Scott called her by telephone while she was at plaintiff's home and they (she and Scott) planned to meet on a street corner about 1:30 p. m. of that day; that they met as planned and then went to Scott's house, arriving there about 2 p. m. and then they "laid around"; that she sat on a couch in the living room about 15 minutes, took off all her clothes, hung them in a closet in the bathroom, and then went to bed in the living room; that Scott sat in a chair in the living room for "some time," then took off some of his clothes, went to the bathroom and returned to the living room with some of his clothes on (but she could not remember what clothes he was wearing), and then he stood around on the floor; that after they had been in the house "some time" three men and a woman broke into the house and entered the room where she and Scott were; that she took her clothes off in Scott's house in order to rest; and that was the first time she had disrobed at Scott's house. After her attention was called to her deposition wherein she had testified that it was not "always her custom" to disrobe at Scott's house and that on some occasions when she was

there she would disrobe and go to bed and that sometimes Scott would take his clothes off too, she testified that there were other occasions (other than May 1st) when she disrobed there. She testified further that on other occasions when she was at Scott's house he took his clothes off, but he was not in the nude in her presence; and that she had not seen Scott every ten days or two weeks from the time of the marriage to the separation. After her attention was called to her deposition she testified that during the time from the marriage on July 8, 1941, to the separation on May 1, 1943, she saw Scott on an average of every week or ten days, and on these occasions she met him on a street corner about 1:30 p. m. and then she went with him to his house or to see ''some friends''; that by the expression ''some friends'' she meant only one person, that is, Scott's sister-in-law; that on those occasions when she went with him they went to Scott's house more often than they visited the friend; that on two or three occasions when they went to his house other persons were there, but she did not remember who they were; that on the days when she went with Scott she returned to plaintiff's home about 4 p. m. and did not tell plaintiff where she had been, but she told him she had been shopping; that her visits with Scott were without her husband's knowledge; that she had known Scott about 15 years; that prior to her marriage with plaintiff she kept company with Scott, went to dances with him, went deer hunting with him every season over a period of approximately 10 years, and went rabbit hunting with him; that she had known plaintiff about a year before the marriage; and that at the time plaintiff made the proposal of marriage he said he would take care of her, but he did not mention the West Los Angeles property (which was part of the property described in the joint tenancy deed). After her attention was called to her deposition, she testified that he did say, as a part of the proposal, that if she would marry him he would put the West Los Angeles property in joint tenancy. She testified further that she accepted plaintiff's proposal of marriage about 2 or 3 months before the marriage; that she saw Scott once a week or once in two weeks while she was engaged to plaintiff, and saw Scott at a dance hall about a week before the marriage.

Mrs. Buck, an investigator who had been employed by plaintiff, testified that she, two men (who were detectives), and the plaintiff entered the living room of Scott's house on May 1, 1943, and at that time the defendant was in bed,

and Scott was "just getting out of bed" and was undressed; that plaintiff went to the bed, pulled the blanket off defendant and she (defendant) did not have any clothes on; that defendant's clothes and Scott's clothes were on a chair in the living room; that Scott put his clothes on and went into the kitchen, and the defendant then got out of bed and put her clothes on; that when she (this witness) served the papers (presumably the complaint and summons) on defendant on May 19, 1943, she said to defendant, among other things, "Well then, you did marry him [referring to plaintiff] to try to get some of his property?" and she replied, "Yes, I wanted it." She testified further that when she served the papers she said to defendant, "In other words, you and Dennis Scott planned that you were to marry Mr. Schaub and get some of his property, is that right?" and defendant replied, "Well, we talked about it, yes. He thought it was all right for me to marry Mr. Schaub."

Dennis Scott testified that he had known defendant about 15 years; that he kept company with her before the marriage; that he saw her at a dance hall about one week before the marriage and he took her home from the dance, but he did not remember whether he brought her to the dance; that she never told him that she expected to marry plaintiff; that she never told him anything about plaintiff's property; that she was not at his home before the marriage; that the first time he took her to his home was about 9 or 10 months after the marriage; that he could not say whether she removed her clothing on that first occasion; that she had been to his house on the average of once in two weeks, and on some of those occasions she took her clothes off and he took his clothes off; that when they were both in the nude in the same room she sat or lay on the couch and he sat in a chair, and sometimes when she was in bed in the nude he sat on the side of the bed or in a chair; and that he never had sexual relations with her.

It was stipulated that if Mrs. Jetty Dall were called as a witness she would testify that she had called at Scott's house on Sunday mornings at 9 or 10 o'clock about a year before the marriage and on those occasions defendant was there cooking dinner, and that on the night preceding each of those calls defendant and Scott had been at a dance hall.

It was stipulated that another investigator employed by the plaintiff, if called as a witness, would testify substantially the same as Mrs. Buck had testified, except as to conversation.

Plaintiff testified that he had four grown sons; that defendant considered his proposal of marriage for a period of approximately ten days, and during that time he told her he "would be glad to make joint tenancy" of the West Los Angeles property; that they were married on July 8, 1941, and he made the joint tenancy deed on August 13, 1941, conveying the West Los Angeles property and certain desert property to her and himself; that after the marriage they were on a trip about two weeks, and then, after staying at home a short time they went away again and were gone about a month; that soon after they returned home from the last trip he suspected that she was not loyal to him, and the reasons for his suspicion were that she wanted to have a dress shortened, that she took the dress to Scott's sister-in-law to have it shortened and stayed there all day, that she went to the same place on the same day of the following week and stayed all day, and that one evening defendant said to him that as she was walking home she "saw this other party"; that in June, 1942, he suspected her again by reason of the "way she acted," the "way she was going out," the "way she dressed," and telephone calls she received; that he employed Mrs. Buck, the investigator, about October 1, 1942, and she reported to him in October, 1942, that defendant was keeping company with Scott, but he (plaintiff) did not say anything to defendant about the report because an attorney told him to let the detectives follow her; that Mrs. Buck made reports to him about three times each month from November, 1942, to May 1, 1943; that in November, 1942, he believed that defendant was having illicit relations with Scott, but he (plaintiff), on advice of counsel, did not say anything to her about it; that plaintiff had sexual intercourse with defendant after November, 1942; that she was a very satisfactory wife for a year after the marriage, and that they lived as husband and wife from the time of the marriage until the separation.

The marriage in itself was a contract under which each of the parties undertook the obligations of mutual respect, fidelity and support. (Civ. Code, § 155.) ■ The agreement to marry was a representation that the obligations of marriage would be faithfully kept. ■ The finding that defendant represented "that she would be a good and faithful wife to said plaintiff and fulfill all the obligations of a wife to a husband; that at the time of making said representations said defendant, Ellen Schaub, had no intention of fulfilling the same" was justified by the evidence. Prior to the

marriage plaintiff pointed out to defendant one property which he had deeded to his sons, reserving a life estate, and stated that he would put other properties in the joint tenancy of himself and the defendant. The inducement for the deeds was the implied representation by defendant that she would faithfully keep her marriage obligations; the fraud consisted of her secret intention not to perform those obligations and the concealment of that fact from plaintiff. Five weeks after the marriage the property was placed in joint tenancy without knowledge upon plaintiff's part of defendant's secret intentions. The parties then stood in a confidential relationship toward each other, with all of the obligations which that relationship entails. Under the rule stated in *Murdock* v. *Murdock* (1920), 49 Cal.App. 775 [194 P. 762], defendant's concealment of any illicit relations with Scott after the marriage would have furnished a sufficient ground for the rescission by the court of plaintiff's deed. We need not go so far in the present case to find good grounds for annulment of the deed. There was no evidence that within the five weeks intervening between the date of marriage and the date of the deed defendant had resumed her former relations with Scott, but there was ample evidence that she intended to do so. Plaintiff's right to a decree annulling the deed was so clear and complete as to preclude the existence of any reasonable argument against it. The judgment must be affirmed as to the provision which decreed annulment of the deed. The remaining question is whether it should also be upheld as to the provision which annulled the marriage.

Section 82 of the Civil Code allows the annulment of a marriage where the consent of one of the parties has been obtained by fraud. Under section 1572 of the Civil Code false representations made with intent to deceive, the willful suppression of material facts, and the making of promises without intention to perform them constitute fraud. ▮ As a rule the fact represented or suppressed, as the case may be, is deemed material if it relates to a matter of substance and directly affects the purpose of the party deceived in entering into the contract. He may be relieved from his contract upon proof that he would not have entered into it if he had known the facts and that performance of it would give him substantially less than he bargained for. ▮ The code does not specify the particular frauds which will justify the rescission of a contract of marriage, but it is well settled in this state, and in most other jurisdictions, that they do not cover the

broad field of deceits that render voidable other types of contracts. The only fraud which will support a proceeding for annulment of marriage is one which goes to the essence of the marriage relation. (*Marshall* v. *Marshall* (1931), 212 Cal. 736 [300 P. 816, 75 A.L.R. 661]; *Bragg* v. *Bragg* (1934), 219 Cal. 715 [28 P.2d 1046]; *Millar* v. *Millar* (1917), 175 Cal. 797 [167 P. 394, Ann.Cas. 1918E 184, L.R.A. 1918B 415]; *Barnes* v. *Barnes* (1895), 110 Cal. 418 [42 P. 904]; *Foy* v. *Foy* (1943), 57 Cal.App.2d 334 [134 P.2d 29].) And because of the interest of the state in the institution of marriage, our courts have announced their concurrence in certain well established rules which are said to be the offspring of the policy of the state. ▪ One of these is that neither of the contracting parties may question the validity of the marriage upon the ground of reliance upon the express or implied representations of the other with respect to such matters as character, habits, chastity, business or social standing, financial worth or prospects, or matters of similar nature. It is conclusively presumed that each of the parties made his or her own independent investigation and was satisfied with the result. (*Marshall* v. *Marshall, supra,* 212 Cal. 736, 739.) ▪ Another rule is that although the parties, by the marriage itself, impliedly promise to fulfill the commonly understood obligations of husband or wife, the failure to fulfill them is not actionable fraud, that is to say, it does not make out a case of a promise made without intention to fulfill it, within the meaning of section 1572 of the Civil Code, so as to furnish a sufficient ground for annulment. (*Bragg* v. *Bragg, supra,* 219 Cal. 715; *Barnes* v. *Barnes, supra,* 110 Cal. 418.) In the latter case it was said that the doctrine of *caveat emptor* governs, and forecloses reliance upon express or implied representations of either of the parties as a ground for annulment. This is not too strict a rule in view of the fact that the divorce laws provide a means of escape from unsuccessful alliances. If neither party is guilty of conduct after marriage which would justify a divorce, it can seldom occur that the success of the marriage will be defeated by antecedent conditions or conduct. ▪ But where the fraud is so grievous that it places the injured party in a relationship that is intolerable because it cannot honorably be endured, it robs the contract of marriage of all validity. Equity will not deny relief where a plan of deceit has been laid out and consummated which must inevitably defeat the essential purposes of the deceived party in entering into the relationship. Such deceit goes

directly to the validity of the contract. Each case must stand upon its own facts and be examined critically in order to determine, if fraud has been shown, whether the consequences which were due to and which did ensue were wholly destructive of the purposes of the innocent party in entering into the marriage relation. The general principles which govern are well established in our state. We need not look beyond the decisions of our own courts for aid in applying them to the unique facts of the present case. It has been held that a marriage will be annulled upon proof of a secret, preconceived determination, persisted in after marriage, not to allow matrimonial intercourse. (*Millar* v. *Millar, supra,* 175 Cal. 797.) Also, concealment of pregnancy by a man other than the intended husband is a good ground for annulment (*Baker* v. *Baker* (1859), 13 Cal. 87), and a representation by a woman, prior to her marriage, that she is able to bear children when she knows she is physically incapable of it will justify a decree of annulment (*Vileta* v. *Vileta* (1942), 53 Cal.App.2d 794 [128 P.2d 376]; *Aufort* v. *Aufort* (1935), 9 Cal.App.2d 310 [49 P.2d 620]).

 The facts, as disclosed by the evidence and as found by the court, make this an exceptional case. The court found that defendant had an agreement with Scott that she would marry plaintiff, procure an interest in his property, and that she and Scott would continue their intimacies and sexual relations which had existed between them for some time prior to the inauguration of their plan. Whether they had such an agreement is immaterial; the question is whether defendant intended to break off or to continue her relations with Scott upon her marriage to plaintiff. Defendant's intentions, as established by the findings, were that she planned to marry a self-respecting old gentleman, acquire an interest in his property, and at the same time continue with her love affair. As previously stated, she discussed the matter with Scott, who "thought it was all right," but the understanding which they reached did not contemplate a severance of their relations. The manner in which defendant intended to carry them on is best judged by the way they were carried on. It was no furtive, secret assignation, nor were the intimacies the unexpected denouement of unplanned opportunities. Defendant's association with Scott was open, flagrant and continuous. She visited his home on innumerable occasions in the afternoons and was apparently indifferent as to how many people would

know of her conduct, as long as she was able to keep her husband in the dark. Nothing seemed to matter to her after she had obtained an interest in the property. Such an unconventional and bold association could not fail to attract the attention of friends and neighbors. Their discussions and comments would inevitably reach the ears of plaintiff sooner or later and he would learn, as others already knew, that he had been duped into a marriage with a woman who was not only unfaithful to him, but openly and shamelessly unfaithful. It could not, within the bounds of reason, have been supposed that plaintiff would not eventually learn the truth. He did learn it and the entire affair developed in due and ordinary course and as it was destined from the beginning to develop. It was not suppression of the truth as to defendant's past, nor as to her character, that constituted the fraud. The law would have regarded plaintiff's acceptance of her in marriage as complete forgiveness if he had known of her past relations with Scott. He is presumed either to have known of them or to have willingly closed his eyes to her earlier life. But this is not true as to the secret intention which she had. He had no means of knowing the purposes which she had in mind unless she chose to disclose them to him, which, of course, was quite out of the question. Concealment was necessary in order to obtain plaintiff's consent to the marriage; if there had been no concealment there would have been no marriage. Plaintiff thought he was taking unto himself a wife but he only gave his name and his property to an impostor. Defendant did not intend to conduct herself as a wife; she withheld all loyalty and faithfulness and duped plaintiff into what he thought was an honorable relationship, but which, in truth, was one in which he could only suffer humiliation and bitter disappointment.

In the early case of *Baker* v. *Baker, supra,* a marriage was held void *ab initio* for the fraud of the defendant in concealing her antenuptial pregnancy by a stranger. Mr. Justice Field, speaking for the court, at page 103, said: "Again, the first purpose of matrimony, by the laws of nature and society, is procreation. . . . The second purpose of matrimony is the promotion of the happiness of the parties by the society of each other, and to its existence, with a man of honor, the purity of the wife is essential. Its absence under such circumstances as necessarily to attract attention must not only tend directly to the destruction of his happiness, but to entail humiliation and degradation upon himself and family. We

can conceive no torture more terrible to a right-minded and upright man than a union with a woman whose person has been defiled by a stranger, and the living witness of whose defilement he is legally compelled to recognize as his own off-spring, as the bearer of his name and the heir of his estate, and that, too, with the silent, if not expressed, contempt of the community. By no principle of law or justice can any man be held to this humiliating and degrading position, ex-cept upon clear proof that he has voluntarily and deliberately subjected himself to it.'' The sentiments expressed by the learned justice are of simple truths which time or conditions cannot modify. The words which so graphically picture the plight of the husband in that case, are equally descriptive of the intolerable conditions which fell upon plaintiff herein as a consequence of his marriage. These were, in fact, some-what more distressing than the ones which confronted Mr. Baker, for the transgression of the latter's wife was a thing of the past, and a righteous married life, which evidenced her repentance and reform, would naturally have appealed to the charity of her critics and tempered their condemnation. But in the present case there was no repentance, no reformation, and no desire to seek the shelter of an honorable married life as a means of escape from the past. Defendant planned and persisted in a course of conduct which would have made it necessary for any self-respecting man to separate himself from her and to sever the odious relationship. We are persuaded that a court of equity should not acknowledge that there was any validity in the questioned marriage and we conclude that there was no just ground for refusing a decree annulling the marriage upon the findings of fraud.

▮ The question of the sufficiency of the evidence to sup-port the findings may be disposed of briefly. The fact that defendant and Scott had been associating together for 15 years, and their admissions that for 10 years they had gone together on hunting trips in the mountains, which occasion-ally lasted for as long as 10 days, did not necessarily require a finding that they had during that time maintained sexual relations. It did, of course, prove that they had ample oppor-tunity. But when it was proved by their own admissions that upon innumerable occasions after the marriage they met in the home of Scott and there habitually paraded before each other in the nude, their adulterous inclinations and propen-sities were established beyond a doubt. Acceptance of their

mere denials of sexual intercourse would have required a lack of sophistication in such matters rarely to be encountered, even among judges, for evidence of sexual inclinations and of reasonable opportunities is almost invariably accepted by the courts as sufficient proof of adultery. (9 Cal.Jur. 642; 2 C.J.S. 492.)

The court found that plaintiff did not discover defendant's fraud until May 1, 1943, the date when plaintiff and the detectives broke into the Scott house. Defendant challenges the sufficiency of the evidence to sustain this finding, contending that it was shown by the testimony of plaintiff that he made the discovery some six months earlier, when one of the detectives told him that his wife was associating with Scott. Plaintiff testified upon cross-examination that he believed from these reports that his wife was carrying on an illicit relationship with Scott, but that upon the advice of his attorney he continued to live with her in the marital relationship while he was making further investigations. Defendant insists that upon this testimony the court should have found that plaintiff waived his right to have the marriage annulled. Subdivisions 3 and 4, section 82 of the Civil Code, provide that a marriage may be annulled where the consent of either party was obtained by fraud ''unless such party afterwards, with full knowledge of the facts constituting the fraud, freely cohabited with the other as husband or wife.'' The questioned finding is not unsupported by the evidence. Notwithstanding plaintiff's testimony that he believed his wife was carrying on illicit relations with Scott, it appears that his belief was founded upon suspicion and not upon knowledge of the facts. Neither plaintiff nor the detectives had any knowledge of the character of the relationship until they entered the house and found defendant and Scott together. Suspicion or a belief founded upon inconclusive circumstances is not the ''full knowledge of the facts constituting the fraud'' which constitutes ratification of a voidable marriage. Plaintiff filed his action four days after he found his wife and Scott together. It was not until defendant's deposition was taken and the case was tried that there was a full disclosure of the extent of the association of defendant and Scott before the marriage and the course of conduct which they had followed after the marriage.

The judgment is affirmed.