JUDITH WOLFE, Plaintiff and Counterdefendant-Appellee, *v.* JAMES WOLFE, Defendant and Counterplaintiff-Appellant.

First District (4th Division)   No. 77-336

Opinion filed June 29, 1978.

JOHNSON, P. J., dissenting.

Stanley F. Kaplan and Beermann, Swerdlove, Woloshin & Barezky, both of Chicago (Miles N. Beermann and Paul J. Bargiel, of counsel), for appellant.

Irving Lewis, of Chicago, for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

Judith Wolfe, plaintiff, sued her husband, James Wolfe, defendant, for divorce. Defendant filed a countercomplaint for annulment on the grounds that he had been induced to marry plaintiff by her fraudulent representation that her former husband was dead when, in fact, he was alive, plaintiff having been divorced from him. Defendant claims that his religious beliefs would have prevented him from marrying plaintiff, a divorced woman, while her former husband was living.

After the case was tried before an advisory jury, the court, on motion of defendant, directed a verdict for defendant and dismissed plaintiff's complaint for divorce. The jury returned a verdict in favor of defendant on his countercomplaint for annulment and the trial court entered a judgment for annulment on the verdict. Thereafter, based on plaintiff's post-trial motion, the trial court set aside the annulment judgment and dismissed defendant's countercomplaint for annulment for want of equity. Defendant appeals, contending that the plaintiff's false representation made to induce a marriage which violated defendant's religious beliefs, constitutes fraud which goes to the essence of the marriage relationship thereby providing grounds for annulment and that the judgment granting the annulment should be reinstated.

We reverse the trial court's ruling on plaintiff's post-trial motion with regard to the annulment and reinstate the judgment for annulment.

The record indicates that the parties were married in March 1965, and separated in November 1973. One child, John, was born to the couple. On December 14, 1973, plaintiff filed suit for divorce on grounds of extreme and repeated mental cruelty. Defendant answered the complaint. On May 10, 1974, defendant filed a countercomplaint for annulment alleging that before their marriage, plaintiff had fraudulently misrepresented her status as that of a widow when, in fact, her first husband, from whom she had been divorced, was still alive. Defendant learned that plaintiff's first husband was alive in February of 1974, after the couple had separated and plaintiff had initiated divorce proceedings. The countercomplaint alleged that defendant, a practicing Roman Catholic, would not have married plaintiff if he had known that her first husband was alive and, further, that she knew of his religious convictions before their marriage. Defendant claimed that the alleged fraud vitiated his consent to the marriage. Attached to the countercomplaint were a purported death certificate issued by the State of Arizona, produced by plaintiff as proof of her former husband's death, and an affidavit, completed by plaintiff prior to the parties' marriage and attesting to her widowhood in accordance with the requirements of defendant's church.

Plaintiff answered the countercomplaint denying the material allegations and affirmatively stating that defendant became aware that

her former husband was living prior to February 1974, and having such knowledge, continued to cohabit with her.

The case ultimately went to trial before an advisory jury on plaintiff's third amended complaint for divorce and defendant's amended countercomplaint for annulment. The complaint for divorce was dismissed for want of equity on defendant's motion for a directed verdict at the end of the plaintiff's case, and no appeal has been taken from that portion of the order directing the dismissal of the complaint for divorce.

The following testimony was adduced at trial relevant to the complaint for annulment. Plaintiff, Judith Wolfe, called as an adverse witness under section 60 of the Illinois Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60), testified that she previously had been married to and divorced from Thomas Haffner, and that defendant knew this fact. When questioned about the contents of the affidavit executed by her at the time of the parties' marriage, plaintiff admitted that her assertion that her first husband was dead was not true and known by her to be false at the time she signed the affidavit. She also admitted that her former husband had been living at the time she executed the affidavit, but later claimed that she was not sure whether her ex-husband was dead at the time she married defendant. She refused to answer questions regarding the manner in which she obtained the purported death certificate of Thomas Haffner which had been attached to the countercomplaint for annulment, claiming the fifth amendment privilege against self-incrimination. Plaintiff also denied that defendant had refused to marry her as long as her former husband was living.

Thomas Haffner, plaintiff's ex-husband, testified for the admitted purpose of proving that he was in fact alive.

Defendant, James Wolfe, testified that prior to his marriage to plaintiff he had a series of conversations with her in which he told her that as a Roman Catholic he could not marry her because she was divorced. He further testified that plaintiff thereafter informed him she had been notified by an acquaintance that her first husband had been killed in an automobile accident. With the belief that plaintiff was, in religious contemplation, a widow rather than a divorcee, defendant agreed to proceed with marriage plans. Defendant claimed that plaintiff had shown him a purported death certificate of Thomas Haffner before their marriage. He maintained that had he known the ex-husband was alive he would not have entered into the marriage.

Based on this testimony the advisory jury returned a verdict for defendant on the countercomplaint for annulment. In accordance with the jury verdict, the trial court entered an order annuling the marriage.

In response to the various post-trial motions filed by the parties the trial court subsequently entered an order providing, *inter alia*, (1) that the

judgment for annulment was vacated; (2) that the findings of the advisory jury on the issues of annulment were contrary to law and the evidence; and, (3) that the countercomplaint for annulment was dismissed. The defendant appeals from that portion of the final order denying the relief of annulment and from the denial of his post-trial motion.

OPINION

■■ To sustain a cause of action for annulment based on fraud, the law requires proof of fraud which goes to the essence of the marriage contract. (*Louis v. Louis* (1970), 124 Ill. App. 2d 325, 260 N.E.2d 469; *Bielby v. Bielby* (1929), 333 Ill. 478, 165 N.E. 231.) It must be shown that the fraud was of such a nature as to vitiate the actual consent of the defrauded party.

■■ The fraudulent representation giving rise to the action must be of an existing fact, essential to the marriage contract (*Louis v. Louis* (1970), 124 Ill. App. 2d 325, 260 N.E.2d 469), which makes impossible the performance of the duties and obligations of the marriage relationship (*Helfrick v. Helfrick* (1927), 246 Ill. App. 294), or renders the continuation of the marriage dangerous to life or health (*Lyon v. Lyon* (1907), 230 Ill. 366, 82 N.E. 850).

Within the framework of these time-honored rules this court must determine whether the false representation made by the plaintiff to induce a marriage in violation of defendant's religious convictions is of such a nature as to constitute grounds for annulment in this State. We believe that it is.

Although fraud has long been recognized as a ground for the annulment of a marriage, the public policy interest in upholding the security of the marriage contract has caused the application of more rigid tests for materiality in suits for annulment than in suits for the rescission of other contracts. Thus, courts have limited the number of fact situations which will give rise to an action for annulment by determining that many types of fraud are not materially or essentially related to the performance of marital obligations, generally. The early Illinois cases, relied on by plaintiff, reflect this desire to preserve the state of marriage at all costs, even when the relationship is no longer viable.

For instance, it was held that an annulment would not be granted where a woman falsely represented that she was a good, religious woman when in fact she was a prostitute (*Beckley v. Beckley* (1904), 115 Ill. App. 27); where a woman falsely stated that she had been cured of epilepsy (*Lyon v. Lyon* (1907), 230 Ill. 366, 82 N.E. 850); and where a man misrepresented to his intended wife that he was chaste, however, another woman was pregnant with his child (*Hull v. Hull* (1915), 191 Ill. App. 307). Finding in each case that the alleged fraud did not impair the ability

of the parties to live together and perform the obligations and duties of marriage, it was reasoned that the defrauded party "got possession of the same flesh and bones he bar gained for; * * * '[t]he law makes no provision for the relief of a blind credulity, however it may have been produced.' Kent. Com., vol. 2, p. 78." *Beckley v. Beckley* (1904), 115 Ill. App. 27, 30-31.

Moreover, in *Helfrick v. Helfrick* (1927), 246 Ill. App. 294, the court affirmed the dismissal of the complaint for annulment which alleged that the wife had falsely represented to her prospective husband that she was pregnant with his child at the time of the marriage, when, in fact, she was pregnant by another man. The court held that the facts stated in the complaint did not render the performance of the marital duties impossible.

A woman's false representations that she intended to live with her prospective spouse and make a home for him were held to be an insufficient basis to sustain the award of an annulment in both *Bielby v. Bielby* (1929), 333 Ill. 478, 165 N.E. 231, and *Johnson v. Johnson* (1930), 257 Ill. App. 587. These courts recited the rule that fraud sufficient to establish grounds for annulment must be as to some existing fact, not a mere promise made with an affirmative intent not to perform at some future time.

Although recognizing the existence of these early decisions, defendant contends that the more recent Illinois decisions, as well as the decisions of other jurisdictions, indicate a trend towards a more liberal approach to annulment based on a subjective determination of the type of fraud which reaches the essence of the marriage relationship. Particularly, defendant cites *Arndt v. Arndt* (1948), 336 Ill. App. 65, 82 N.E.2d 908, in which the court held that a husband was entitled to an annulment where the wife, pregnant at the time of the marriage, untruthfully represented that he was the father of her unborn child. This decision must be compared with *Helfrick,* cited earlier. Although based on essentially identical facts, opposite decisions were reached by the court in each case. Adopting the rule "of the modern, and, in our judgment, better reasoned cases," the court in *Arndt* held that it is not a defense to an action for annulment based on fraud that the innocent party negligently failed to ascertain the truth or falsity of the representations made. The court held that the plaintiff would be entitled to an annulment on proof of the charges contained in the complaint.

The most recent Illinois case on this subject, *Louis v. Louis* (1970), 124 Ill. App. 2d 325, 260 N.E.2d 469, involved a suit for annulment based upon a wife's charges that the husband fraudulently represented before their marriage that he wanted children and was willing to consummate the marriage, which he thereafter refused to do. In determining that the misrepresentations were sufficient to sustain an annulment based on

fraud, the court distinguished *Bielby* and *Johnson* and held that the misrepresentation of the willingness to consummate the marriage related to present rather than future facts. The court stated:

"In determining the materiality of fraud, the above-cited cases indicate the salutory policy that marriages ought to be protected and promoted. Where, as in the instant case, the fraudulent representations induce consent in form only and performance of marital obligations is rendered impossible, annulment of such a marriage is appropriate. [Citations.] The policy of protecting and nurturing the institution of marriage is not fostered by declining to legally declare the nonexistence of such marriages when, in reality, they do not and cannot exist." 124 Ill. App. 2d 325, 330, 260 N.E.2d 469, 472.

In yet another Illinois case, *Vachata v. Vachata* (1965), 58 Ill. App. 2d 78, 207 N.E.2d 129 (abstract), it was held that an annulment would be granted where a husband concealed from his prospective wife the fact that he was guilty of a felony and under indictment at the time of the marriage.

In each of the newer cases, the court necessarily found that the fraud complained of went to the essence of the marriage and rendered its continuation impossible, or dangerous to the defrauded party's life or health, and that but for the fraudulent representations, the defrauded party would not have given his or her consent to the marriage.

The plaintiff argues that the more recent cases do not indicate a departure from the older case law. In each of the recent cases, plaintiff maintains, the fraud alleged was the type of fraud which would have a universal impact on all marriages and would always prevent the performance of the marital obligations, while in the instant case, the defendant's religious beliefs are a subjective impediment to the continuation of the marital relationship. We disagree.

Although citing the same standards and attempting to work within the confines of the old cases, the courts in the more recent cases obviously applied a more liberal standard than in the early cases in determining what goes to the essence of the marriage. The early cases involved the application of an objective standard to determine what relates to the essence of the marriage and, apparently, only misrepresentations concerning the ability to perform the physical aspects of the marriage contract were considered essential. In the later cases, however, a more subjective standard has been employed, taking into consideration the effect the discovered fraud had on the complaining party's ability to continue in the marital relationship. Thus, an annulment will be granted where the fraud goes to the essence of the particular parties' marriage, making it impossible for that marriage to continue.

An analysis of the case law in other jurisdictions is instructive on this

point. As in Illinois, the older cases of many jurisdictions reveal the courts' distinct predisposition to deny annulments based on fraudulent representations. (See *Wells v. Talham* (1923), 180 Wis. 654, 194 N.W. 36; *Boehs v. Hanger* (1905), 69 N.J.Eq. 10, 59 A. 904.) However, in recent years several jurisdictions have adopted a more liberal view of the grounds for annulment.

For example, in the recent New Hampshire decision of *Jordan v. Jordan* (1975), 115 N.H. 545, 345 A.2d 168, a petition for annulment was granted upon allegations that plaintiff, a Roman Catholic, did not know of defendant husband's prior marriage at the time she married him, that she would not have married him had she known, and that she could not live with defendant because of her religious beliefs. Just 10 years before, the same court, admittedly following the strict approach, had denied an annulment under similar circumstances, finding that as a matter of law the allegations were insufficient to state an action for annulment. *Fortin v. Fortin* (1965), 106 N.H. 208, 208 A.2d 447.

The decisions in the State of Wisconsin also indicate a transition in judicial philosophies. In *Wells v. Talham* (1923), 180 Wis. 654, 194 N.W. 36, the court denied an annulment to a Roman Catholic who alleged that his wife fraudulently concealed from him the fact that she had been divorced and that her ex-husband was living at the time the parties married. The court, adopting the strict rule prevailing in Massachusetts and the majority of other jurisdictions at that time, rejected the plaintiff's contention that the fraud went to the essence of the marriage because he would not have entered into the marriage if the facts had been known to him and, therefore, the marriage lacked reality of consent.

Thirty-eight years later the same court decided *Masters v. Masters* (1961), 13 Wis. 2d 332, 108 N.W.2d 674. In *Masters* the husband sued the wife for an annulment on the grounds that she had fraudulently induced him to marry her by telling him that she was pregnant with his child. In fact, she was not pregnant. The trial court denied the annulment and the supreme court reversed. The reviewing court considered and rejected the reasoning in *Helfrick v. Helfrick* (1927), 246 Ill. App. 294, the Illinois case with essentially the same facts. Citing *Wells,* the court acknowledged that a stricter rule is applied in annuling marriages than in rescinding ordinary contracts. However, the contrast to *Wells,* in enunciating the test of materiality, the court in *Masters* stated:

> "We deem the character of such false representations * * * to be material as a matter of law, if they in fact caused the marriage to be entered into under circumstances that no marriage would have taken place absent such false representation." 13 Wis. 2d 332, 341, 108 N.W.2d 674, 679.

Other jurisdictions have adopted a liberal policy regarding annulment

based on fraud. Best known are the decisions of the New York courts, which have long applied a type of "but for" test to determine the materiality of the fraud. We are aware that the New York decisions have in part developed because of stringent New York divorce laws, however, the rationale of these cases is convincing. See *Shonfeld v. Shonfeld* (1933), 260 N.Y. 477, 184 N.E. 60; *Di Lorenzo v. Di Lorenzo* (1903), 174 N.Y. 467, 67 N.E. 63.

California courts consider whether the complaining party would have entered into the marriage had he known the true facts and whether knowledge of the fraud makes continuation of the marriage impossible. In *Douglass v. Douglass* (1957), 148 Cal. App. 2d 867, 307 P.2d 674, the wife sued for an annulment alleging that her consent to the marriage had been induced by the defendant's fraud in falsely representing to her that he was a respectable and honorable man when in fact he had previously been convicted of grand theft and had served a jail sentence. The court on review reversed the trial court's dismissal of the complaint, stating that the test of the sufficiency of the allegations is "whether the false representations or concealment were such as to defeat the essential purpose of the injured spouse inherent in the contracting of a marriage." (148 Cal. App. 2d 867, 868-69, 307 P.2d 674, 675.) The court further held:

> "[W]e do not doubt that either party to the marriage has a right to a decree of annulment where the fraud is so grievous that it places the injured party in a relationship that is intolerable because it cannot honorably be endured. 'Equity will not deny relief where a plan of deceit has been laid out and consummated which must inevitably defeat the essential purposes of the deceived party in entering into the relationship.' (*Schaub v. Schaub, supra,* 71 Cal. App. 2d 467, 476.)" 148 Cal. App. 2d 867, 869, 307 P.2d 674, 676. Accord, *Handley v. Handley* (1960), 179 Cal. App. 2d 742, 3 Cal. Rptr. 910; *In re Marriage of Turner and Rabie* (1974), 40 Cal. App. 3d 917, 115 Cal. Rptr. 594.

Finally we find the language in *Bilowit v. Dolitsky* (1973), 124 N.J. Super. 101, 304 A.2d 774, persuasive. In *Bilowit,* the plaintiff was induced to marry the defendant on his representation that he was a practicing Orthodox Jew. Thereafter, plaintiff learned that defendant had misrepresented his religious convictions because he knew she would not otherwise have married him. In determining that the facts were sufficient to justify a judgment for annulment, the court stated:

> "To plaintiff the religious beliefs and convictions of her husband were essential to her marriage. She could not have properly performed the duties of a wife and mother, following the rules and teachings of her faith, without the support of a husband holding the same beliefs. Defendant, having substantially and knowingly

misrepresented the same to her, and plaintiff having relied thereon in entering into the marriage, this court holds the fraud to which plaintiff was subjected to be 'gross and far-reaching,'* * *. [Citations]

That a subjective test may render more difficult the fact-finding process of the court should not prevent a litigant from obtaining relief where justice dictates." 124 N.J. Super. 101, 104, 304 A.2d 774, 776.

■■ Although the subjective test has not been adopted in many jurisdictions, we believe it is the better rule. As noted by one commentator "if we are to annul where continued intercourse is injurious to health, we might well be willing to annul where continued intercourse is injurious to the soul. "(R. Kingsley, *Fraud As A Ground For Annulment Of A Marriage,* 18 So. Cal. L. Rev. 213, 228 (1945).) Where a marriage is induced by fraud or deceit executed in such a manner as to secure a relationship which otherwise would never have existed, and knowledge of the fraud renders the continuation of that relationship intolerable and deleterious to the injured party's physical and mental well-being, equity dictates that such a marriage be declared invalid. It is not in the public interest to protect such a marriage to the serious detriment of the defrauded party. Besides, there is no inalienable or constitutional right to deceive and misrepresent with impunity. The consequences of the falsehood must be measured, in part, by their impact on the party offended.

In this case the advisory jury, after hearing the testimony, determined that the evidence supported the granting of an annulment. Although not binding on the trial court, the advisory jury's determination was persuasive, and the trial court entered judgment on the verdict. Then, after considering the plaintiff's post-trial motion and memoranda submitted by both parties, the able and concerned trial court decided that because the alleged fraud related to religious convictions, it did not, as a matter of law, go to the essence of the marriage relationship and, therefore, dismissed the countercomplaint for annulment for want of equity.

We hold that fraudulent representations of religious convictions are a legally sufficient basis upon which an annulment may be predicated. To one who is deeply religious, his faith is the foundation on which he builds his life and conducts his everyday affairs. His religious commitment determines his attitudes and behavior toward his fellow men. When one partner has discovered that unwittingly he has been duped into a violation of his religious beliefs and that indeed he has been living in a state of calamitous and grievous sin, that discovery may well make continuation

of the relationship impossible. In such an instance the fraud eliminates the innocent party's consent to the relationship and goes directly to the essence of the marriage relationship, for in our opinion the essence of the marriage is not merely "flesh and bones" but heart and soul and mind as well.

■■ An action for annulment is based on proof of a false representation or a concealment tantamount to a misrepresentation, on which the complainant justifiably relied and a showing that the alleged fraud was the inducing cause; that the complainant would not have consented to the marriage had he known the truth. Each case must be determined on its facts and the fraud alleged must be proved by clear and convincing evidence. (See *Bilowit v. Dolitsky* (1973), 124 N.J. Super. 101, 304 A.2d 774.) Factors such as the length of the marriage, the birth of offspring, the length of the parties' cohabitation after the discovery of the fraud and the possibility of reconciliation are relevant to a determination of the materiality of the fraud alleged.

■■ The record in this case supports the granting of an annulment to defendant. Defendant alleged in his complaint that the plaintiff misrepresented the fact that her previous husband was dead when in fact he was living. There were two exhibits attached to the complaint: an affidavit made by plaintiff in which she states her former husband is dead and the death certificate of her former husband.

At the trial plaintiff's counsel stipulated that the statements made by plaintiff in the affidavit regarding the death of her first husband were not true and were known not to be true at the time she signed it. Defendant's testimony indicates that he had a series of conversations with the plaintiff prior to the marriage in which he told her that his religious beliefs prevented him from marrying a divorced woman whose husband was alive.

Plaintiff refused to answer questions concerning the purported death certificate; however, defendant's testimony establishes that plaintiff had shown him the death certificate before their marriage in order to induce his consent to the marriage. The testimony also indicates that defendant is honest and sincere in his religious commitment. He would not have gone through with the marriage ceremony but for the misrepresentations of the plaintiff. It is also clear from the record that knowledge of the fraud has made it impossible for defendant to resume or continue the marital relationship. We agree with the defendant that the family unit is not to be considered sacrosanct when founded upon falsehood, misrepresentation and deceit wilfully planted.

The facts support the granting of an annulment in this case and meet the requirements which we have set forth above. We, therefore, reverse

the trial court's ruling on the plaintiff's post-trial motion and reinstate the judgment for annulment.

Reversed. Annulment granted.

ROMITI, J., concurs.

Mr. PRESIDING JUSTICE JOHNSON, dissenting.

I respectfully dissent. Fraud, in order to constitute a ground for an annulment, must go to the essence of the marriage relationship. (*Lyon v. Lyon* (1907), 230 Ill. 366, 82 N.E. 850.) The degree of fraud sufficient to vitiate an ordinary contract will not afford sufficient ground for annulment of a marriage, and it is not sufficient that plaintiff relied on false representations and was deceived. (*Bielby v. Bielby* (1929), 333 Ill. 478, 165 N.E. 231.) In order to constitute fraud, for which an annulment of a marriage is properly decreed, the misrepresentation must be of some existing fact, as a legal or physical impediment to the marriage, it must be of something essential to the marriage relation—something making impossible the performance of the duties and obligations of that relation or rendering its assumption and continuance dangerous to health or life. Accordingly, fraudulent misrepresentations as to birth, social position, fortune, character, social standing, personal qualities, good health, and temperament are not enough for annulment. (26 Ill. L. & Prac. *Marriage* §53 (1956).) I do not believe the fraudulent misrepresentations involved herein go to the essence of the marriage.

A case of factual similarity is *Wells v. Talham* (1923), 180 Wis. 654, 194 N.W. 36. In *Wells*, cited with approval in *Lyon*, the wife falsely and fraudulently represented that she was a widow, when, in fact, she had been divorced, and her prior husband was still living. The husband learned these facts, related the same to the Roman Catholic priest of his parish, and was advised that the marriage must be repudiated and he must separate from his wife or suffer excommunication. The court noted that there are accidental qualities which do not constitute the essential and material elements on which the marriage relation rests. The court continued:

> "It is argued that if the facts had been known to the decedent he would not have entered into the contract and therefore the decedent never gave the consent necessary to the validity of the marriage contract. In other words, the question whether the complaining party would have entered into the contract if the real facts had been known is made quite controlling as to the materiality of the false representations. There is some basis for this

argument in some of the New York cases, but it is a view which we cannot accept and which is out of harmony with the decisions of this court and the prevailing rule in America." (*Wells,* 180 Wis. 654, 664-65, 194 N.W. 36, 40.)

A man who means to act upon such representations should verify them by his own inquiry. The law presumes that he used due caution in a matter in which his happiness for life is so materially involved, and it makes no provisions for relief of a blind credulity, however it may have been produced. I Bishop on Marriage and Divorce, par. 167.

Fraudulent representations which induce the other party to marry in violation of religious principle have not been held to be sufficient fraud upon which to predicate an annulment. (*Fortin v. Fortin* (1965), 106 N.H. 208, 208 A.2d 447; *Cassin v. Cassin* (1928), 264 Mass. 28, 161 N.E. 603; *Oswald v. Oswald* (1924), 146 Md. 313, 126 A. 81; *Boehs v. Hanger* (1905), 69 N.J. Eq. 10, 59 A. 904.) The above cited cases all presented similar factual situations to the case at bar, and in all the cases the courts refused to grant annulments on such bases. In *Oswald,* the plaintiff sought annulment on the grounds that his wife had fraudulently represented herself to be a widow at the time of their marriage, when, in fact, her previous marriage had ended in divorce. Plaintiff argued that his Roman Catholic religious beliefs did not permit marriage to a divorcee and that, therefore, annulment was proper. In denying the annulment, the court noted:

> "The question is raised whether members of one church can succeed in nullifying a marriage upon false representations when the same representations would afford no cause of action to members of other churches. We are not inclined to give our sanction to such a proposition." (*Oswald,* 146 Md. 313, 317, 126 A. 81, 82.)

In analyzing similar facts in *Boehs,* the court noted that the fraud asserted was not of the essence, in spite of the fact that it contravened the plaintiff's religious beliefs, because to hold otherwise would wrongfully enhance the church's law above the State's, the courts being bound to uphold and administer the latter, not the former.

The court in *Fortin* reminds us that the weight of authority supports the rule that the concealment of a previous marriage terminated by divorce is an insufficient ground for annulment. The court said:

> "For better or worse we have not considered annulment of a marriage an easy substitute for legal separation or divorce. Deception in the marital quest may result in an unhappy marriage but to grant annulment ‘ * * * ’ merely because of deception regarding past conduct would in many cases in practical

effect extend the divorce legislation far beyond its limits and restrictions.' " (*Fortin,* 106 N.H. 208, 209, 208 A.2d 447, 448.)

In *Cassin,* the defendant's misrepresentation of her prior marital status was held to be not sufficiently essential to the marriage to justify relief through annulment regardless of her husband's religious beliefs.

In *Villasenor v. Villasenor* (1951), 107 N.Y.S.2d 951, 201 Misc. 951, the court found that the defendant's representation that his prior marriage had been annulled when, in fact, he was divorced was not a sufficiently material misrepresentation to justify annulment. The New York court reached this finding despite a showing by the plaintiff that her religion forbade her marriage to a divorced person.

In *Braun v. Braun* (1955), 142 N.Y.S.2d 627, a New York court held that concealment of a prior marriage was not sufficient to warrant annulment because it did not go to the essence of the marriage contract.

Although Mr. Wolfe was aware of his wife's ex-husband being alive, he took no action until after she had filed for divorce and was seeking alimony. His complaint for annulment was filed after 11 years of marriage and 10 years after the birth of their son.

For these reasons, the annulment should be denied.