Clarence John Arndt, Appellant, v. Margaret Haas Arndt, Appellee.

Gen. Nos. 43,796, 43,831.

FEINBERG, P. J., dissenting.

Opinion filed December 13, 1948. Released for publication December 27, 1948.

AIKEN, McCURRY, BENNETT & CLEARY and EUGENE J. GRABER, all of Chicago, for appellant; CHARLES R. AIKEN, of Chicago, of counsel.

ARTHUR and EDWARD GOLDBLATT, both of Chicago, for appellee.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Our judgments in the consolidated appeals of plaintiff from a decree dismissing for want of equity his complaint for the annulment of his marriage to defendant and from a subsequent order directing him to pay $150 for attorney's fees and expense money in defending the first appeal (331 Ill. App. 85), were reversed by the Supreme Court (399 Ill. 490) with directions to consider the merits of the first appeal and to set aside the order allowing appellee suit money. Pursuant to these directions we file this opinion as to the merits of the appeal from the decree, and hereby reverse the order allowing the appellee suit money.

We state only the facts believed necessary to a consideration of the matter now before us. The plaintiff charged that the marriage ceremony of January 18, 1944, had been induced by the fraudulent representation of defendant that the plaintiff was the father of the child with which defendant was pregnant. Defendant answering, admitted the representation charged in the complaint, denied that it was false and affirmed that the plaintiff was the father of her child. The parties agree that they had illicit relations before the marriage, and that they did not live and cohabit together after the ceremony. After trial the court entered a decree reciting that he had heard the witnesses represented in support of the respective positions of the parties and finding that the marriage was a good and legal marriage and that plaintiff was the father of defendant's child, and dismissing the complaint for want of equity. Plaintiff filed an amended petition asking that the decree be vacated and set aside in order that alleged newly discovered evidence might be introduced or, in the alternative, that a new decree be entered expressly refraining from adjudicating any question as to the paternity of defendant's child. After hearing on this petition the court vacated the decree and, without hearing any further testimony so far as the record shows, entered a second decree

identical with the first, except that in lieu of the finding that plaintiff was the father of defendant's child there was inserted a paragraph reciting that the plaintiff contends that the child born February 27, 1944, is not his child, and that defendant contends that said child is the child of the parties to the suit, "but this court does not make any finding with respect to the paternity of said child."

Plaintiff's position on appeal is, as stated in his petition to vacate the decree, and not denied by defendant, "that at the first hearing of evidence in this cause the chancellor ruled that it would make no difference whether plaintiff was or was not the father of the child born to the defendant in as much as under the law of Illinois plaintiff was not entitled to an annulment even if he established that he were in fact not the father of defendant's child"; that "the decree of dismissal contains language showing that the chancellor expressly declined to pass upon the paternity of the child," and that "it is this refusal by the chancellor to pass upon the issue of paternity which plaintiff claims is reversible error." The fact that this refusal was pursuant to plaintiff's alternative prayer for relief in his amended petition, is no longer in the case, the Supreme Court having overruled our position on that question.

The first question is: Does the record before us preserve for review the court's alleged failure or refusal to determine the paternity of the child? In determining whether there was error in failing or refusing to pass on that question we are not concerned with the weight of the evidence as to the paternity of the child. In *Goodrich v. Sprague,* 376 Ill. 80, 86, where the court failed to pass upon a motion for a new trial filed with a motion for judgment notwithstanding the verdict, the court said, " . . . matters not ruled upon by the inferior court are not subject to the consideration of the Appellate Court unless the lower court's failure to rule is made the subject of an assign-

ment of error, in which case *the propriety of such failure is the question presented to the Appellate Court and not the merits of the matter upon which the trial court refuses to act.*" (Italics ours.) It was there held that the Appellate Court was justified in reversing the judgment entered notwithstanding the verdict and that it erred in passing upon and denying the alternative motion for a new trial and entering judgment; that it should have remanded the cause to the trial court to pass on the alternative motion for a new trial. Other cases to the same effect are *Armour v. Pennsylvania R. Co.,* 353 Ill. 575; *Ottawa, O. & F..R. Valley R. Co. v. McMath,* 91 Ill. 104; *Read v. Cummings,* 324 Ill. App. 607, and *Zwierzycki v. Metropolitan Life Ins. Co.,* 316 Ill. App. 345.

The weight of the evidence not being before us, a report of proceedings containing the evidence produced on the trial is not necessary. It is only necessary that the failure of the court to pass upon the paternity of the child be shown in the record. Rulings of a court at a trial are properly shown by a report of proceedings in the form of a complete stenographer's report or a condensed statement, or, in lieu thereof, a written stipulation of the facts material to the controversy, either of which must be certified by the trial court to be correct. (Supreme Court Rule 36 (1) (b) (c) (d).) These rulings cannot be shown, as plaintiff insists, by undenied averments of the parties, such as the statement quoted above from plaintiff's petition to vacate the decree. However, under sec. 74(2) of the Civil Practice Act [Ill. Rev. Stat. 1947, ch. 110, par. 198, subpar. (2); Jones Ill. Stats. Ann. 104.074, subpar. (2)] abolishing all distinction between the common-law record, bill of exceptions and a certificate of evidence for the purpose of determining what is properly before the reviewing court, the matters ruled on by the trial court may be shown in the common-law record. *Warner v. Burke,* 302 Ill. App. 85. It appears

from the complaint and answer, and from the decree, that the paternity of the child was an issue in the case. It further appears from the decree that the court heard the witnesses presented in support of the respective positions of the parties and that the court "does not make any finding with respect to the paternity of said child." It therefore sufficiently appears from the common-law record that the paternity of the child was an issue in the cause; that the court heard testimony on the issue and did not ultimately make any finding thereon. This preserves plaintiff's point for review.

The complaint charges that plaintiff, "believing defendant and relying upon her representations that he was the father of her unborn child," married defendant. As it is silent as to any investigation by plaintiff as to the truth or falsity of her representations, we assume on this appeal that no investigation was made.

The second question presented is, whether false representations as to the paternity of the child which defendant is carrying are grounds for annulment of a marriage at the suit of the plaintiff, who had had illicit relations with defendant and accepted and believed her statement without investigation as to its truth or falsity. There are only four Illinois cases in which similar representations, made under like circumstances, were in issue before a reviewing court or discussed by it: *Lyon v. Lyon,* 230 Ill. 366 (1907); *Hull v. Hull,* 191 Ill. App. 307 (1915); *Helfrick v. Helfrick,* 246 Ill. App. 294 (1927); and *Short v. Short,* 265 Ill. App. 133 (1932). In the *Lyon* case, annulment of the marriage was sought on the ground of false representations that defendant had been entirely cured of her epilepsy and had had no attacks thereof for more than eight years. In discussing the case of *Di Lorenzo v. Di Lorenzo,* 174 N. Y. 467, the court said that the representations relied upon by the plaintiff in that case for annulment of his marriage "is similar in kind to that of a pregnant

woman who induces a man with whom she has had illicit intercourse to marry her by the false representation that he is the father of her child. But such representation, under such circumstances, does not constitute fraud for which the marriage will be annulled. . . .'' In the *Hull* case the wife sought annulment of the marriage because of false representations of her husband before marriage as to his not having had intercourse with other women. In denying the relief sought, the court discussed the reasons given by courts holding marriages voidable when a woman conceals from her intended husband, with whom she has not had illicit relations, her pregnancy by another man. These statements relating to the question before us are plainly *obiter dicta*. *People v. Callopy*, 358 Ill. 11, 19; *McAdams v. McAdams*, 267 Ill. App. 124. In *Helfrick v. Helfrick*, 246 Ill. App. 294, the issue was squarely presented and it was held that such misrepresentation was not ground for annulment. Five years later the same court in *Short v. Short*, 265 Ill. App. 133, ignored its former opinion and held that a cross-bill filed in a separate maintenance action should have been sustained as to allegations of duress and coercion, ''as well as the allegation of fraudulent representations that the child was the child of plaintiff in error,'' citing *Gard v. Gard*, 204 Mich. 255 (1918), and *Jackson v. Ruby*, 120 Me. 391, 115 Atl. 90 (1921), also found in 19 A. L. R. 77, where in a note to the case (p. 80) the editors say: ''The reported case (*Jackson v. Ruby*, ante, 77) is the first one upon the subject which has been reported since the publication of the former annotation. It is shown in the former note that while the tendency of the earlier cases was to refuse relief in such cases, the later ones show a very strong tendency in the opposite direction, and, in the absence of special circumstances, grant the relief. The Maine court now adds the weight of its authority to that side of the controversy.'' Confirming this view as to the

trend of the later decisions is the statement in 35 Am.
Jur., Marriage, sec. 139, that ''Later cases have gen-
erally granted relief by way of annulment of a mar-
riage entered into by a man because of the fraudulent
representations by a woman that the child with which
she is pregnant is his.'' *Lyman v. Lyman,* 90 Conn.
399 (1916), and *Winner v. Winner,* 171 Wis. 413
(1920), are in the later trend.

Massachusetts clings to its earlier decisions.
*Foss v. Foss,* 94 Mass. (12 Allen) 26 (1866), and *Cre-
hore v. Crehore,* 97 Mass. 330 (1867), cited by our
Supreme Court in the *Lyon* case, *supra,* are probably
the most discussed cases on the subject. In the *Foss*
case, on facts essentially identical with those before
us the relief was denied, not because ''adequate cause
for the decree of nullity is not set forth in the libel,''
but because the libellant had not made any investiga-
tion as to the truth or falsity of the alleged misrepre-
sentations, the court saying:

''He took no steps to ascertain the truth of her state-
ments concerning the paternity of the child, but, rely-
ing solely on her assurance on that subject, he entered
into the contract of marriage. . . . Whatever may
have been the motives which led him to forbear all in-
quiry, it is a sufficient answer to his claim to be relieved
from his contract that the deceit, if any, which was
practiced upon him was submitted to voluntarily and
wilfully. . . .''

The following year, in the *Crehore* case, the court in a
six line opinion, silent as to the duty of investigation,
if any, cited the *Foss* case and denied relief. The *Cre-
hore* decision was construed in *Arno v. Arno,* 265 Mass.
282 (1928), as denying relief under any circumstances.
The court said:

'' . . . careful examination in an attempt to get
at the truth was made by the libellant. He has not

been slack in his effort to understand the situation. He has been grossly deceived by deliberate false representations, and there is nothing to indicate that he would have married had he not relied upon what was told to him and those he called to his assistance.

Nevertheless we think the decision in *Crehore v. Crehore, supra,* which has not, apparently been questioned here since 1867, is controlling. We are aware that *Foss v. Foss, supra,* has been questioned elsewhere; *Gard v. Gard,* 204 Mich. 255; *Lyman v. Lyman,* 90 Conn. 399; and that a different rule obtains in some other States. *Winner v. Winner,* 171 Wis. 413. *Jackson v. Ruby,* 120 Maine, 391. *Wallace v. Wallace,* 137 Iowa 37. See 18 L. R. A. 375, and L. R. A. 1916 E, 650. But we are not impelled, thereby, to overrule the decision in *Crehore v. Crehore,* and to depart from a hard but salutary rule.''

In a case reported in the same volume (*Jekshewitz v. Groswald,* 265 Mass. 413), the court held that a relation of trust and confidence exists between parties contemplating marriage, and that the deceived party might rely upon the representations of the defrauding party as to the ceremony necessary to a valid marriage. If this be true as to a matter of common information accessible to all, it must apply with far greater reason to representations of a matter so exclusively in the knowledge of the defrauding party as the paternity of her child. It seems clear that in Massachusetts, *Foss v. Foss, supra,* is no longer authority on the question before us. Massachusetts has always taken an extreme position on annulment of marriages because of fraud. In *Hanson v. Hanson,* 287 Mass. 154, the court said that their decisions were more strict than the authorities in some other jurisdictions. Illustrative of this strictness is the decision in *Vondal v. Vondal,* 175 Mass. 383 (1900), where concealment of syphilis by the wife was held not to be ground for annulment, the

court holding that the wife could, notwithstanding, bear children, even though the children would probably be tainted with it. It is difficult to understand how public policy would subject an unborn child to syphilis —until recently regarded as incurable—in order to uphold or perpetuate a contract or status based on fraud. As said in *Bielby v. Bielby,* 333 Ill. 478, 483, 484: "Fraud sufficient to vitiate a marriage must go to the essence of the marriage relation." That the alleged misrepresentation before us does go to the essence of the marriage is convincingly stated in *Winner v. Winner, supra* (417, 418), the court saying:

"On the other hand, the concealment by the woman of the paternity of her child is a fault so grievous that there is no excuse or palliation for it. By the fraud she foists upon her husband a spurious offspring which he must acknowledge as his knowing it not to be. He must nurture and maintain it and invest it with all the rights of legitimate children, including that of inheritance. Such a fraud is vital and goes to the essentials of the marriage relation. . . . The marriage contract implies that the woman is in present condition to bear her husband children, at least so far as she knows. In such a case as we have she knows she cannot till the spurious issue is born. It has been held that a spouse infected before marriage with a venereal disease commits such a fraud upon the other who is not aware of it as to warrant an annulment of the marriage. . . . The carrying and concealment of a spurious issue must be considered at least an equal fraud."

This view is supported by the greater weight of authority, even where relief is denied. When relief is denied it is usually for reasons, stated in varying terms, involving the equitable doctrine of clean hands and the duty of plaintiff to investigate as to the truth or falsity of the representations. As to the doctrine

of clean hands, our Supreme Court in *Carpenters'
Union v. Citizens' Committee to Enforce Landis
Award,* 333 Ill. 225, 250, said:

"The rule does not go so far as to prohibit a court of
equity from giving its aid to a bad or a faithless man
or a criminal. The dirt upon his hands must be his
bad conduct in the transaction complained of. If he
is not guilty of inequitable conduct toward the defend-
ant in that transaction his hands are as clean as the
court can require."

In the case before us the transaction complained of is
not the illicit intercourse between the parties but the
alleged illicit intercourse between defendant and an-
other, resulting in her pregnancy and the concealment
of that fact from plaintiff by falsely representing that
he was the father of the child. It cannot be contended,
from the pleadings in this case or the record before us,
that plaintiff conspired, aided or acquiesced in the
illicit intercourse with a third party resulting in the
conception of the child. He is, therefore, innocent in
respect to the transaction complained of. *Winner v.
Winner, supra, Gard v. Gard, supra,* and *Lyman v.
Lyman, supra.*

The general rule is that ". . . one who
has intentionally deceived the other to his prejudice
is not to be heard to say, in defense of the charge of
fraud, that the innocent party ought not to have trusted
him or was guilty of negligence in so doing." 23 Am.
Jur., Fraud and Deceit, sec. 146, page 948, citing *Kehl
v. Abram,* 210 Ill. 218. Other Illinois cases supporting
the text are *Morel v. Masalski,* 333 Ill. 41, 46; *Hess v.
Weicker,* 308 Ill. 270, 274, and *Hoffner v. Reinberg,*
296 Ill. App. 13, 18. This is especially true where there
is a relation of trust and confidence as between parties
contemplating marriage. (*Jekshewitz v. Groswald,
supra*), and where knowledge as to the truth or falsity
of the alleged misrepresentation is peculiarly within
the possession of the defrauding party.

██ The later cases, granting relief from representations as to the paternity of defendant's child, take very strong positions against any duty of the plaintiff to make an investigation. In *Winner v. Winner, supra,* the court discussed the holding in *Foss v. Foss, supra,* as to the duty to investigate, and said:

"Besides, what inquiry could a decent, honorable man make under such circumstances? The Massachusetts court suggests three lines of conduct: first, inquiry in the neighborhood where the woman lives; second, a medical examination; or third, waiting till the birth of the child to ascertain the fact of paternity. We respectfully suggest that neither line of conduct befits an honorable man and would not be resorted to by the average man. To do so would be at once to besmirch the reputation of the woman he intended to marry. He would conclusively prove his unbelief in her veracity; he would show to others that he had no faith in her chastity and would blacken her reputation as to that in the eyes of all to whom inquiries were directed; and, if he awaited the birth of the child, he might bastardize his own offspring and bring added disgrace to himself and wife. No right-minded man guilty of having wronged a woman or sharing a wrong with her would so act. He would do as plaintiff did in this case—marry her. That is the only honorable reparation possible—the only method of legitimatizing the offspring which he believes to be his and of saving the honor of the woman he has promised to marry. The act of marriage in such a case is not the result of negligent credulity, but of honorable motives to repair as far as possible wrongs inflicted or shared by him."

In *Jackson v. Ruby, supra,* the position of the court is stated more tersely, in the following words: "Nor can we subscribe to the doctrine that it is ever the duty of a man to subject the woman he intends to marry to the unspeakable humiliation of an inquisition like that prescribed by the court in *Foss v. Foss.*" See also

*Lyman v. Lyman, supra.* The statement in the quotations from textbooks in the *Lyon* case, *supra,* that on grounds of public policy fraudulent representations of one party as to birth, social position, fortune, good health and temperament, cannot vitiate the marriage contract, and that as to these "caveat emptor is the harsh but necessary maxim of the law," and that the law "makes no provision for relief of a blind credulity, however it may have been produced," have no application to fraud which goes to the essence of the marriage relation, and is ground for relief. Nor does the interest of the State in the preservation of the marriage relation extend to marriages based on fraud going to the essence of the marriage relation. As stated in *Lyman v. Lyman, supra,* "Certainly neither society nor the State representing it can have an interest favorable to the successful perpetration of a fraud, or to the perpetuation of the normal consequences of one like this which do not end with the marriage tie, but involve matters of presumptive paternity, the obligations which go with paternity, and the right of succession to property."

By the greater weight of the modern, and, in our judgment, better reasoned cases, we believe the plaintiff entitled to annulment of his marriage on proof of the representations charged, even though he made no attempt to ascertain the truth or falsity of the alleged misrepresentations. It was therefore essential to a proper determination of the case that the court determine the paternity of the child born to defendant. We are not concerned with the necessity or propriety of preserving the court's conclusion thereon in the decree or in any other manner. We do hold it necessary that the court consider the evidence relating to the paternity of the child together with all other evidence in the case, and, if upon such consideration he find that plaintiff is not the father of the child, grant the relief prayed, and deny it if the evidence fails to prove the charge.

█ The decree dismissing plaintiff's complaint is reversed and the cause remanded with directions to determine the paternity of the child and enter such decree as the court deems proper. If the further hearing is had before the judge who heard the cause originally, the decree may in his discretion be upon the evidence already heard by him, with or without any further evidence. *Smith v. Smith,* 222 Mass. 102, 108.

*Reversed and remanded with directions.*

TUOHY, J., concurs.

FEINBERG, P. J., dissents: The majority opinion treats the record as presenting two questions: (1) Did the chancellor refuse to determine the only issue in the case raised by the pleadings—namely, the paternity of the child? (2) Do such alleged false representations with respect to the paternity of the child, if proven, justify annulment of marriage?

The complaint admits illicit relations with defendant as late as April 14, 1943. The answer claimed illicit relations with plaintiff; that she was conceived with child by him on or about June 13, 1943; that the parties were married January 18, 1944; that the child was born February 27, 1944, and that plaintiff visited with her frequently from March 1942, down to and including June 13, 1943. The child was born in wedlock. The evidence is not preserved and, therefore, we cannot say that there was not medical proof, if such be needed, that the period of gestation could extend from the admitted act of illicit relation, April 14, 1943, to February 27, 1944.

In *Pike v. People,* 34 Ill. App. 112, at p. 113, the court said:

"Medical writers of the highest celebrity and authority agree, and the fact is well established, that pregnancy is a condition which may exceed the nominal limit for its duration; but the actual limit to this excess, cannot, in the present state of physiological science be accurately known. Approximately, its duration may

be stated from 260 to 308 days after coition, and the average or usual period as 276 days. Chap. 3, Wharton and Stillis, Vol. 2, p. 1, Med. Juris., 3d edition, tables and authorities there cited.''

In *People v. Hill*, 152 Ill. App. 78, referring to *Pike v. People*, this court said:

''The statement . . . that the usual duration is from 260 to 308 days, is not the statement of a rule of law but of a rule of nature, subject to many exceptions of which the court takes judicial notice.''

In *Dazey v. Dazey*, 50 Cal. App. (2d) 15, 122 P. (2d) 308, at p. 310, the court quoted from the publication ''Principles and Practice of Obstetrics,'' Sixth Edition, ch. 5, p. 120, by Joseph B. DeLee, A. M., M. D., Professor of Obstetrics and Gynecology, Emeritus, University of Chicago, Consultant in Obstetrics, Chicago Lying-In Hospital and Dispensary, Consultant in Obstetrics, Chicago Maternity Center, the statement by the author ''that if we compute the period from fruitful coition to birth, it varies from 220 days to 330 days . . . the average being two hundred and seventy days.''

In *In re McNamara's Estate*, 181 Cal. 82, 183 Pac. 552, at p. 555, it is said:

''While the average period of gestation is generally taken as 280 days, there are instances vouched for by reputable authorities where the period has exceeded 330 days, and there are instances, too well authenticated apparently to admit of reasonable question, where the period has exceeded 320 days.''

Plaintiff having admitted illicit relations within the possible limits of the period of gestation, he should be foreclosed, under the announced principles of public policy of this State, fully discussed in the cases cited later, from undertaking to illegitimatize this child upon the pretense of false representation as to the paternity of the child.

As pointed out in the majority opinion, the court had a hearing upon the amended petition to vacate the first decree dismissing the complaint for want of equity. It then proceeded upon that hearing to enter another decree, being the one appealed from. The majority opinion states: "After hearing on this petition, the court vacated the decree and without hearing any further testimony, so far as the record shows, entered a second decree . . . ." This statement in the majority opinion is unwarranted. The instant decree recites that the cause came on to be heard on the contested trial call and regularly reached for trial; that the parties were present in open court, in person as well as by counsel; that the court heard the parties in support of their respective bills of complaint, *the witnesses presented* in support of their respective positions, and the arguments of counsel. There is nothing in the record to the contrary. The chancellor could well have considered upon the second hearing not only the evidence then presented but as well the evidence which he originally heard. That the chancellor did have that right is suggested by the remanding portion of the majority opinion. It is there stated: "If the further hearing is had before the judge who heard the cause originally, the decree may in his discretion be upon the evidence already heard by him, with or without any further evidence." If effect is to be given to the recital in the instant decree "but this Court does not make any finding with respect to the paternity of said child," which the majority opinion holds discloses sufficiently upon this review a refusal of the chancellor to decide the material issue in the case, then certainly, to be consistent, effect must be given to every other recital in the decree, and we are in duty bound, under the well settled rule of law, which requires no citation of authorities, to assume that when the decree recites that the court heard evidence, and the evidence is not preserved, that it was sufficient to justify the decree.

82

There can be no proper approach to a consideration of the attack made upon this decree, without full regard for the principle of law prevailing in nearly every jurisdiction and so aptly stated with approval in *Orthwein v. Thomas*, 127 Ill. 554, at p. 562, in dealing with the subject of legitimacy of children:

" 'The law presumes that every child in a Christian country is, *prima facie*, the offspring of a lawful, rather than a meretricious, union of the parents,' . . . the law is unwilling to bastardize children, and throws the proof on the party who alleges illegitimacy, and in the absence of evidence to the contrary, a child, *eo nomine*, is therefore a legitimate child. . . . The presumption and charity of the law are in his favor, and those who wish to bastardize him must make out the fact by clear and irrefragible proof. The presumption of law is not lightly to be repelled. It is not to be lightly broken in upon, or shaken by a mere balance of probabilities."

This reasoning is applicable to any challenge to the legitimacy of a child, in whatever form the proceeding takes.

In *Matthes v. Matthes*, 198 Ill. App. 515, a bill was filed to annul the marriage. A child was born in wedlock. The court, upon a hearing, dismissed the bill for want of equity and said:

"The law is well established that in the absence of evidence to the contrary, an actual marriage is presumed regular and valid, and though such presumption may be rebutted, yet evidence of *invalidating* facts must be strong, distinct, satisfactory and conclusive; and if there is any evidence to support a finding in favor of the marriage it will be sustained. . . . In following this rule of law, the courts no doubt were actuated by the fact that the marriage relation had a direct bearing upon the welfare of the community, especially with reference to the protection of any children born

of such marriage, as in the case at bar. The standard of public morals is, in a great measure, affected by the *degree of vigilance exercised* to perserve the sanctity of this sacred institution, and for this reason alone *our courts have adopted the salutary policy of viewing with a jealous eye any attempt to tear asunder the bonds of matrimony.*'' (Italics mine.)

As was said by the Second Division of this court in *Norwood v. Norwood,* 333 Ill. App. 469, at p. 473:

''Under the policy of this State all efforts should be expended toward the maintenance of the marital relation rather than its destruction.''

There is no report of proceedings to show that the chancellor ruled, as a matter of law, that the misrepresentations charged in the complaint are not legal grounds for annulment. The first decree having been vacated, it is as though it had never been entered, and whatever the reason for the ruling of the court in entering such a decree becomes wholly unimportant. The recital in the decree, ''but this Court does not make any finding with respect to the paternity of said child,'' could have been based on *Lyon v. Lyon,* 230 Ill. 366, which will be presently discussed. In the interest of sustaining the marriage and the legitimacy of the child born in wedlock, we could very well, in the absence of the evidence, infer that the chancellor not only relied on *Lyon v. Lyon,* but in the light of the evidence before him determined that at the time of the marriage the complainant was fully informed as to the circumstances of the pregnancy of defendant and was willing to marry defendant, even though he believed he was not the father. Such would constitute ratification, since the answer alleged complainant was fully informed. It would not be inconsistent with the recital that the court does not make any finding as to paternity, nor with the decree dismissing the complaint for want of equity. If, on the other hand, this recital

should be viewed as a failure on the part of the chancellor to rule upon the issue raised by the pleadings, then we are confronted with the further question as to the effect of such a recital in a decree dismissing a complaint for want of equity. If the dismissal for want of equity in legal effect adjudicates the only issue in the case—namely, the paternity of the child—then such a recital, as quoted, has no place in the decree, should not be sanctioned and cannot govern. It has been repeatedly held by this court in many cases, and not reversed by our Supreme Court, that where a decree dismisses a complaint for want of equity, findings of fact or unnecessary recitals have no proper place in such a decree.

In *Hyde Park Investment Co. v. Hyde Park State Bank,* 257 Ill. App. 539, this court said:

"Findings. of fact have no place in a decree dismissing a bill or intervening petition for want of equity."

To the same effect are *State Bank of Chicago v. Christensen,* 195 Ill. App. 496; *Lazarus v. Allied Finishing Specialties Co.,* 316 Ill. App. 667, and *Rosenzweig v. Roitman,* 266 Ill. App. 124.

In *Masonic Fraternity Temple Ass'n v. Breitung,* 131 Ill. App. 194, this court said:

"Everything else but the actual ordering part of the decree is immaterial, and surplusage. The other findings do not support the decree and have no proper place therein. They in no manner justify the ordering part of the decree, which is the purpose of findings."

*Goodrich v. Sprague,* 376 Ill. 80, and like cases cited in the majority opinion, are not in point in support of the majority position that the recital in the instant decree is sufficient to disclose a refusal of the chancellor to rule upon the paternity issue. The *Goodrich* case, and the others of like character, deal with the Practice Act regulating the duty of the trial court to pass upon

a motion for new trial when filed with a motion for judgment *non obstante veredicto*. None of the cases deals with the subject matter of improper recitals in a decree dismissing a complaint for want of equity. In view of the importance of the question, whether false representations, as alleged in the complaint, are sufficient to justify annulment of marriage, it becomes necessary to review the pronouncements by our Supreme Court upon this subject.

There is no statute in Illinois governing annulment of marriage and, therefore, the power of a court of equity to entertain such a complaint must be upon general equity principles and under general equity powers. The only case before our Supreme Court in which this question was considered is that of *Lyon v. Lyon,* 230 Ill. 366, affirming 132 Ill. App. 45. The pronouncement in *Lyon v. Lyon* was treated by the majority opinion as *"plainly obiter dicta."* On this subject of *dictum* it is well to note what our Supreme Court has said in *Scovill Mfg. Co. v. Cassidy,* 275 Ill. 462, at p. 470:

"We do not think the rule laid down in this last case upon the question here involved was *dictum,* but even if it was, *it was the expression of opinion upon a point in a case deliberately passed upon by the court* . . . ." (Italics mine.)

In *Lyon v. Lyon,* the bill was to annul a marriage on account of fraud and misrepresentation, which induced the complainant to enter into the marriage, the charge being that she was afflicted with an incurable case of epilepsy at the time of the marriage and, though she knew she was subject to attacks of epilepsy, she had falsely represented to him that she had had no attacks for more than eight years, and that she was cured. The marriage was performed in New York, where they had a statute which provided that in case the consent of one of the parties to a marriage was obtained by fraud, such marriage may be annulled. The

statute did not define fraud. Therefore, it became necessary for our Supreme Court to consider first whether the statute of New York governed the remedy in Illinois and, if it did, what type of fraud was contemplated by the New York statute. It was said by the court (p. 369):

"Fraud in the State of New York is not different, we presume, from fraud elsewhere. If the bill does not charge conduct which we would hold fraudulent, we cannot assume that the courts of another State would do so. The bill alleges that the statutes of New York provide that the marriage may be annulled if appellant's consent was obtained by fraud. Our inquiry is therefore whether the bill shows that appellant's consent was obtained by fraud, and the allegation will be construed according to the law of Illinois."

It will be noted that our Supreme Court had squarely before it in the *Lyon* case the question as to what type of fraud, in the absence of statutory definition, would be sufficient to justify an annulment of marriage, and felt called upon to analyze the cases in New York arising under that statute. There is in the court's opinion a review of the authorities and statements by text writers as to the type of fraud which will and will not permit an annulment of marriage. It distinguishes the case of *Gould v. Gould,* 78 Conn. 242, which held that the type of fraud alleged in the *Lyon* case would justify an annulment. There appeared to be a statute in Connecticut that governed that particular situation and controlled the result arrived at by the Supreme Court in the *Gould* case. In deciding that the facts charged in the complaint did not constitute grounds for annulment, our Supreme Court in the *Lyon* case reviewed the case of *Di Lorenzo v. Di Lorenzo,* 174 N. Y. 467, wherein it was held that a representation by a woman to a man that she had given birth to a child of which he was the father, and which she purported to exhibit to him, when, in fact, she had not given birth

to a child, was such a fraud as to justify the annulling of a marriage brought about thereby. Our Supreme Court said (p. 372):

"This representation is similar in kind to that of a pregnant woman who induces a man with whom she has had illicit intercourse to marry her by the false representation that he is the father of her child. But such representation, under such circumstances, does not constitute fraud for which the marriage will be annulled, and we regard the decision in the *Di Lorenzo case* as opposed to the weight of authority." (Citing *Franke v. Franke,* 18 L. R. A. (Cal.) 375; *Foss v. Foss,* 12 Allen, 86; *Crehore v. Crehore,* 97 Mass. 330.)

The reasoning of our Supreme Court in the *Lyon* case, affecting the type of fraud involved in the instant case, was the deliberate expression of the court upon a point which they deemed necessary to discuss and decide in arriving at their conclusion and therefore not *dicta.* The reasoning of the Supreme Court makes clear that the complainant in the instant case cannot maintain a complaint to annul a marriage for the alleged fraud.

There is another important factor which we believe bars the complainant's right to ask for an annulment, and that is the application of the doctrine of *caveat emptor.* In *Lyon v. Lyon,* the court quoted with approval from Schouler on Domestic Relations, par. 23:

"*Caveat emptor* is the harsh but necessary maxim of law.

" 'A man who means to act upon such representations should verify them by his own inquiry. The law presumes that he used due caution in a matter in which his happiness for life is so materially involved, and it makes no provision for relief of a *blind credulity,* however it may have been produced.' (1 Bishop on Marriage and Divorce, par. 167.)"

This was adopted in *Bielby v. Bielby,* 333 Ill. 478, at p. 484.

In *Morel v. Masalski,* 333 Ill. 41, a bill was filed for relief from a contract for the sale of real estate on the ground of fraud and misrepresentation. The bill was dismissed for want of equity. It is there stated:

"In all cases where it is sought to hold one liable for false representations the question necessarily arises whether, under all the circumstances, the party seeking relief had a right to rely upon the representations made. In determining this question the representations must be viewed in the light of all the facts of which the party injured had actual knowledge and also such as *he might have availed himself of by the exercise of ordinary prudence.* If it appears that there were facts and circumstances present at the time the false representations were made *sufficient to put the injured party upon his guard or to cast suspicion upon their truth, and he neglected to avail himself of the warning thus given,* he will not afterwards be heard to complain, for the reason that his own conduct contributed to his injury. . . . A person in possession of his mental facilities is not justified in relying upon representations made when he has ample opportunity to ascertain the truth of the representations before he acts. *When he is offered the opportunity of knowing the truth of the representations he is chargeable with knowledge. If he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by the misrepresentations.* . . . It is only in cases where the parties do not have equal knowledge or means of knowledge of the facts represented that equity will afford relief on the ground of fraud and misrepresentation." (Italics mine.)

If such a doctrine is to be applied to a commercial transaction involving the sale of real estate, certainly

it ought to be applied with more rigidity in a matter affected by public policy, such as marriage and the legitimacy of a child. *Lyon v. Lyon.* When this plaintiff was confronted by the defendant with the representation that she was pregnant by him, it would have been a very simple matter for him to have inquired of her when it was she claimed to have had sexual relations with him that would bring it within the recognized period of gestation. He would then have known, had he inquired of her, that she claimed to have sexual relations with him in June 1943, and at a time when, as he claimed in his petition to vacate the original decree, he was not in Chicago but was in Mississippi. He could have well decided that she was not telling the truth, that the charge was false, and could have undertaken to disprove her charge as he offered to do in his said petition to vacate the first decree. To stand by without any inquiry of her is like the blind credulity referred to with approval in the *Lyon* and *Bielby* cases, and the lack of diligence required in *Morel v. Masalski*. If we adhere to our duty to indulge in every presumption in favor of the decree, we may well reconcile the recital that the "Court does not make any finding with respect to the paternity of said child," with the legal effect of the decree dismissing the bill of complaint for want of equity, on the basis that the complainant having failed to exercise ordinary diligence and inquiry and submitting only to blind credulity to rely upon the alleged false representations, it was not necessary for the court to make any finding as to the paternity of the child in order to dismiss the bill for want of equity. This is the degree of vigilance which courts should exercise in favor of the legitimacy of a child and the sanctity of the marriage institution, as so well stated in *Matthes v. Matthes* and the *Lyon* case. The court was correct in dismissing the bill for want of equity. It should not have included in the decree the quoted

recital and, as pointed out, has no place in the decree.

Plaintiff strongly relies upon *Short v. Short,* 265 Ill. App. 133 (Third District), an opinion by Mr. Justice SHURTLEFF, supporting plaintiff's position that a charge of fraud of the type involved in the instant case is ground for annulment. The same Appellate Court, speaking through Justice SHURTLEFF five years earlier, had held directly the other way in *Helfrick v. Helfrick,* 246 Ill. App. 294 (certiorari denied by the Supreme Court), and called attention to the *Lyon* case as supporting its conclusion. The *Short* case cannot be regarded as an authority in the light of its inconsistent holdings, and the statement made by the same justice that there was no citation of Illinois authority and, therefore, he presumed the question had not been passed upon in this State, apparently overlooking his own opinion in the *Helfrick* case. An added fact in the *Short* case, not present in the *Helfrick* case nor in the instant case, was the taking of complainant, who was a minor 18 years of age, into custody by the sheriff, upon a threat to send him to the penitentiary on a supposed charge of raping the girl, whom he was induced to marry as a result of the threat, a clear case of aggravated duress. The decision in that case should have rested upon the ground of duress.

Lastly, it should be borne in mind that the amended petition, as pointed out in the majority opinion, asks that the original decree be vacated in order to afford plaintiff the opportunity to introduce newly discovered evidence *or, in the alternative,* that a new decree be entered *expressly refraining from adjudicating any question as to the paternity of defendant's child.* The decree granted this alternative relief by the recital in the decree, "but this Court does not make any finding with respect to the paternity of said child." It would seem anomalous that this plaintiff should ask the chancellor to expressly refrain from making any

finding as to paternity, and then complain to this court that the chancellor refused to determine the issue. In the light of all the legal principles and the public policy discussed in this opinion, fundamental justice should estop plaintiff from now raising the question that the chancellor had failed or refused to determine the paternity issue.

The majority opinion suggests this question is no longer in the case, "the Supreme Court having overruled our position on that question." I do not so read the opinion of the Supreme Court. The Supreme Court, in passing upon the dismissal of the appeal, said:

"Parties of record may appeal as a matter of right if they deem themselves aggrieved by the decree *and the question as to whether they are actually so aggrieved has no bearing upon their right to appeal.*" (Italics mine.)

This does not, in my judgment, foreclose us from determining whether upon this record the plaintiff was actually aggrieved by the decree.

The decree of the superior court should be affirmed.