ROBERTA HILL, Plaintiff-Appellant, *v.* WILLIAM HILL, Defendant-Appellee.

First District (3rd Division)   No. 77-1551

Opinion filed December 26, 1979.

Daniel L. Weisz and Bruce A. Glieberman, both of Levin & Weisz, of Chicago, for appellant.

Robert H. Hirsch, of Chicago, for appellee.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

Roberta Hill, plaintiff, filed a complaint against her husband William Hill, defendant, for separate maintenance and for support for herself and her three minor children. The defendant answered and added a counterclaim for annulment or, in the alternative, a divorce. At a bench trial in the Circuit Court of Cook County, the plaintiff's complaint for separate maintenance and the defendant's counterclaim for divorce were denied and the defendant's counterclaim for an annulment was granted. The plaintiff appeals.

The issues presented for review are: (1) whether the trial court's finding concerning the plaintiff's misrepresentation of her pregnancy to the defendant was contrary to the manifest weight of the evidence; (2) whether the trial court erroneously granted the defendant an annulment; (3) whether the court erred in refusing to determine paternity of the plaintiff's three minor children, and (4) whether the trial court erred in denying the plaintiff's complaint for separate maintenance.

It is undisputed that the plaintiff and the defendant were married on October 12, 1975, and that the defendant left the plaintiff on December 26, 1975. A review of the record, however, indicates an inconsistent factual account of the parties' relationship. The plaintiff on direct examination testified that she first met the defendant and had sexual relations with him in April 1960. She further testified that she and the defendant went to hotels and in 1964 began living together in an apartment. The plaintiff alleged that in 1968 the defendant lived with her in her house on a continuous basis but also said he was not present every night. On further questioning the plaintiff said the defendant started living with her on a seven-day-a-week basis when her son Steve was born in 1967.

On cross-examination, however, the plaintiff said she met the defendant in 1961 and started having an affair with him in 1965, when they stayed at hotels. She further stated they began living together in 1969 on a continuous basis. When asked to define continuous, the plaintiff said at least five days a week but not seven.

At the time the plaintiff met the defendant she was living with Claude Drummond and had given birth to two illegitimate daughters by Mr. Drummond. The plaintiff testified that Drummond left her in January of 1964.

The plaintiff gave birth to three illegitimate sons, Craig Drummond,

on January 19, 1966, Steve Drummond, on June 11, 1967, and Daniel Hill on July 14, 1972. She contended the defendant is the father of her three sons and denied having sexual relations with any man other than the defendant after their relationship began.

In support of her paternity claim the plaintiff submitted into evidence an insurance policy on the life of the defendant. Attached to the policy was an application allegedly signed by the defendant which listed "Daniel Hill, my son" as a beneficiary. Also admitted into evidence was a letter dated September 7, 1973, allegedly signed by the defendant which stated that he made child-support payments for Daniel Hill to the plaintiff. Although the plaintiff testified that the signatures on the document belonged to the defendant, she did not present witnesses to corroborate the authenticity of the signatures.

On cross-examination the plaintiff admitted she had applied for and received Social Security benefits for Craig and Steve as surviving children of Claude Drummond, deceased. Although the plaintiff admitted that she told the Social Security Administration that Craig and Steve were Claude Drummond's sons, she also stated that the "Application for Surviving Child's Benefit," which contained such a reference, had been completed by a government employee. She claimed she signed the form without reading it. On recross, the plaintiff denied that Craig or Steve were Claude Drummond's sons. In response to defense counsel's question as to whether the defendant ever acknowledged in writing or in court that Craig and Steve were his sons, the plaintiff responded in the negative.

The plaintiff's three boys were called to testify concerning their relationship with the defendant. All three boys identified the defendant as their father and testified that he bought them items such as school supplies and took them places. Craig "thought" the defendant introduced them as his boys.

Claudette Drummond Bush, the plaintiff's daughter, testified that the plaintiff and defendant began their relationship in 1955 or 1960 and that they started living together in 1969, although she was not living with her mother at that time. She also stated that in 1973 the plaintiff showed her checks from the defendant for Daniel but on cross-examination admitted the checks were payable to the plaintiff and did not specifically refer to Daniel. The witness further testified that although her father, Claude Drummond, was living with the plaintiff at the time Craig and Steven were born, he maintained they were not his children. On cross-examination she testified that the plaintiff lived with Drummond until September 1968, two months before he died.

Darnise Drummond Strossier, the plaintiff's other daughter, testified that the defendant and plaintiff began to live together in 1969 or 1970 and that she saw the defendant two or three times a week at her mother's

house. She could not remember how the defendant referred to the three boys and said he never expressed his relationship with the boys to her. She said the defendant treated the boys like his sons but on cross-examination admitted he treated her like a daughter.

The defendant denies that he is the father of the plaintiff's three minor children. He alleges he did not have sexual relations with the plaintiff until after Steven was born. He said the plaintiff lived with Claude Drummond until he died. He further testified that he did not live with the plaintiff at any time prior to their marriage and he never spent more than two nights in any week with her. He also denied ever acknowledging that the boys were his sons. He admitted letting the boys refer to him as father but said he also let the plaintiff's daughter refer to him as father.

The defendant presented three witnesses: Janice La June Hill, his daughter by a previous marriage; Willa Mae Hill, a friend and business acquaintance, and Doreen Muffet, a former secretary. All three women testified that the defendant lived with his previous wife, Mary Hill, until their separation in February 1973. The defendant's daughter said he lived with her mother continuously and was never gone for more than two nights on business trips.

In support of her complaint for separate maintenance, the plaintiff testified that the defendant never complained regarding her failure to care and cook for him. She said that before and after they were married the defendant had his own bedroom and his meals were served to him in his room. The plaintiff further testified that the defendant told her she treated him the way he liked to be treated. She alleged that over the course of her relationship with the defendant, she gave him approximately $25,000 for business enterprises, including $8,500 the month before their marriage. She also contended that the defendant sponsored a dance on December 25, 1975, and that he left her on December 26, 1975, after she refused to give him $1,400 to pay off debts incurred as a result of the dance.

Testimony also was presented by the plaintiff's children that the defendant was served his meals and ate them upstairs in his bedroom. In addition to saying the defendant was well treated, Claudette Bush testified that after the plaintiff and defendant separated, the defendant told her the plaintiff had disobeyed and lied to him. Darnise Strossier also said the defendant was well treated but that the defendant, in August of 1976, expressed his dissatisfaction with the plaintiff because of the "dance and other things."

To support his counterclaim for an annulment, the defendant alleged that the plaintiff fraudulently represented to him that she was pregnant

with his child. The defendant contended that the plaintiff first approached him about marriage in August of 1975. He testified that he did not respond to this request, but when the plaintiff told him in late September that she was pregnant and had seen a doctor he married her. He further testified that one month after the marriage the plaintiff told him she was rushed to the hospital for an abortion. The defendant said he determined the plaintiff had not been pregnant about a month after they were married and that he moved out of the house on December 26, 1975. He admitted that the plaintiff gave him money the September before their marriage but said it was approximately $1,700.

Roberta Hill was called to testify as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60) during the defendant's case in chief. She testified she did not menstruate during the months of October, November and December. She said she consulted a doctor on December 12, 1975, and test results proved she was not pregnant. On cross-examination, the plaintiff testified that the defendant asked her to marry him in September of 1975. She denied that she knew or told the defendant she was pregnant prior to their marriage. The plaintiff said she discussed the possibility of being pregnant with the defendant around Thanksgiving and that he suggested she see a doctor which prompted the medical test to determine she was not pregnant. The plaintiff testified she told the defendant she was not pregnant on December 15, 1975.

In addition to the testimony regarding the plaintiff's pregnancy, the defendant presented evidence to establish mental cruelty as his grounds for seeking a divorce. The defendant testified that the plaintiff argued with him and accused him of seeing other women. He said he had given the plaintiff money to place ads in the local papers regarding the Christmas dance he was sponsoring and that she lied to him because ads were placed in only seven newspapers and the ads were not paid in full. The defendant also stated the plaintiff forged his name on credit applications and bought merchandise on credit under his name and without his permission. He said his wife did not give him his telephone messages and that his associates were insulted by the plaintiff when they called him at home. As a result, the defendant contended he was denied peace of mind and became nervous and upset.

At the conclusion of the trial the court granted the defendant's counterclaim for annulment. However, the court dismissed the plaintiff's complaint for separate maintenance and the defendant's counterclaim for divorce because both parties failed to establish by competent evidence the necessary allegations. The court found that the plaintiff represented to the defendant at the time of the marriage and prior thereto that she was

pregnant with his child. The court found that her statement was untrue and that the defendant's consent to the marriage based on the plaintiff's misrepresentation entitled him to an annulment.

In granting the annulment, the trial judge specifically stated that one of the primary factors in making his determination was the veracity of the witnesses. The judge noted numerous instances in which the plaintiff had been impeached.

■■ The plaintiff contends that the trial court's finding that she misrepresented her pregnancy to the defendant was contrary to the manifest weight of the evidence. The trial court's duty is to determine whether there has been sufficient evidence to establish either party's contentions, and its findings are presumed to be correct and will not be set aside by a reviewing court unless they are contrary to the manifest weight of the evidence. In the instant case the trial judge viewed the witnesses and had an opportunity to evaluate the credibility of their testimony. (*Graham v. Graham* (1976), 44 Ill. App. 3d 519, 358 N.E.2d 308; *Curry v. Curry* (1975), 31 Ill. App. 3d 972; 334 N.E.2d 742; *Murphy v. Murphy* (1975), 31 Ill. App. 3d 321, 334 N.E.2d 779.) The only testimony on the issue of annulment was provided by the parties to this suit. We do not find that the trial judge improperly gave greater weight to the defendant's testimony in light of the plaintiff's inconsistent testimony that occurred throughout the proceedings. Therefore, we will not disturb the trial court's finding that the plaintiff induced the defendant to marry her by knowingly misrepresenting to him that she was pregnant with his child and that in reliance on this statement the defendant married her, since this finding is not contrary to the manifest weight of the evidence.

■■ However, we find that we must reverse the grant of annulment based on the court's erroneous conclusion of law. To sustain a cause of action for annulment based on fraud, the law in this State requires that the fraudulent representation be of something essential to the marriage relationship. (*Wolfe v. Wolfe* (1979), 76 Ill. 2d 92, 389 N.E.2d 1143; *Louis v. Louis* (1970), 124 Ill. App. 2d 325, 260 N.E.2d 469.) In an action for annulment, unlike an action for rescission of a contract, a party's proof of false representation and reliance is not sufficient. *Wolfe v. Wolfe; Bielby v. Bielby* (1929), 333 Ill. 478, 165 N.E. 231.

The trial court in the instant case relied on *Arndt v. Arndt* (1948), 336 Ill. App. 65, 82 N.E.2d 908. In *Arndt* the appellate court held that the husband was entitled to an annulment of his marriage upon proof that the marriage was induced by the wife's fraudulent representation that the husband was the father of the child with which she was pregnant at the time of the marriage, even though he made no attempt to ascertain the truth or falsity or the alleged misrepresentation. Citing from the Wisconsin case of *Winner v. Winner* (1920), 171 Wis. 413, 177 N.W. 680,

the *Arndt* court found the misrepresentation went to the essence of the marriage because:

> " 'the concealment by the woman of the paternity of her child is a fault so grievous that there is no excuse or palliation for it. By the fraud she foists upon her husband a spurious offspring which he must acknowledge as his knowing it not to be. He must nurture and maintain it and invest it with all the rights of legitimate children, including that of inheritance.' " (336 Ill. App. 65, 75, 82 N.E.2d 908, 912.)

Since the trial court in *Arndt* had not resolved the paternity of the child, the appellate court reversed and remanded the cause to make this determination.

■■ ■ We believe the *Arndt* case, where the woman was actually pregnant, must be distinguished from the instant case where the plaintiff falsely represented she was pregnant. We recognize the courts throughout the country are liberalizing their standards to determine what misrepresentations go to the essence of the marriage relationship. (See *Wolfe v. Wolfe* (1978), 62 Ill. App. 3d 498, 378 N.E.2d 1181, *aff'd* (1979), 76 Ill. 2d 92, 389 N.E.2d 1143.) However, the courts are in general agreement that where the parties have had sexual relations an annulment will not be granted to a man who has married a woman based on her representation of pregnancy. (See Annot., 15 A.L.R.2d 706 (1951); 4 Am. Jur.2d *Annulment of Marriage* §41 (1962). But see *Parks v. Parks* (Ky. 1967), 418 S.W.2d 726; *Masters v. Masters* (1961), 13 Wis. 2d 332, 108 N.W.2d 674.) Generally, the courts hold that representation of false pregnancy does not go to the essentials of the marriage since the wife is not prevented from performing her marital duty of bearing only the children of her spouse. (*Husband v. Wife* (Del. Super. Ct. 1970), 262 A.2d 656.) Relative to the doctrine of pari-delicto, courts will not extricate the defendant who has created his own dilemma based on his illicit intercourse. (*Mobley v. Mobley* (1943), 245 Ala. 90, 16 So.2d 5; *Gondouin v. Gondouin* (1910), 14 Cal. App. 285, 111 P. 756; *Brandt v. Brandt* (1936), 123 Fla. 680, 167 So. 524; *Tyminski v. Tyminski* (1966), 8 Ohio Misc. 202, 221 N.E.2d 486; Annot., 15 A.L.R.2d 706, 726-28 (1951).) We hold as a matter of law that a woman's fraudulent representation of pregnancy which induces a man to marry her is not grounds for annulment. Therefore, the judgment of annulment in the defendant's favor is reversed.

The third issue presented on appeal is whether the trial court erred in refusing to determine paternity of the plaintiff's three minor children who had been born prior to the marriage of the plaintiff and defendant. The plaintiff argues that the paternity of these children was a factor to be considered by the court in determining whether the defendant was

entitled to an annulment. Although we reverse the grant of annulment, for the reasons stated above, we disagree with the plaintiff's third argument.

The plaintiff cites *Arndt v. Arndt* which held that the determination of the paternity of the child allegedly born to the plaintiff and defendant was essential before the court could properly determine whether or not to grant an annulment. However, the *Arndt* case again must be distinguished from the instant case because in *Arndt* the woman was in fact pregnant at the time she represented to the plaintiff that she was pregnant with his child. The appellate court in *Arndt* remanded the case with directions to determine the paternity of the child. Only upon finding that the plaintiff was not the father of the child was the trial court empowered to grant the annulment since, as stated above, the misrepresentation would go to the essence of the marriage relationship.

In the instant case, the trial court found that the plaintiff was not pregnant at the time of the marriage. None of the plaintiff's children were the result of this alleged pregnancy. Therefore, their paternity was irrelevant to the annulment issue.

The plaintiff contends that if the defendant was not the father of the three boys he would not have married her solely upon her representation that she was pregnant with his child. Therefore, she contends that the paternity of the three boys should have been established. However, the trial court specifically found the only reason the defendant married the plaintiff was his reliance on her representation of pregnancy. It is within the trial court's province to determine whether there has been sufficient evidence to establish either party's contentions and the findings of the trial court are presumed to be correct. (*Murphy v. Murphy.*) We believe that the trial court's finding in this regard was not against the manifest weight of the evidence. Therefore, for the reasons stated above the determination of paternity was not a prerequisite to rule on the counterclaim for annulment.

As the plaintiff's final argument on appeal she contends that the trial court erroneously denied her action for separate maintenance. At the conclusion of all the evidence the trial court found that, although the parties had lived separate and apart, the plaintiff was at fault. He based his findings on the testimony of the defendant that the plaintiff argued with the defendant, accused him of going out with other women and forged his name on credit accounts. The court found that none of the statements made by the defendant were rebutted on cross-examination of the defendant or by rebuttal witnesses.

On May 23, 1977, when the trial court conducted the hearing and rendered its decision in this matter, it was the law in this State that in order to sustain an action for separate maintenance the plaintiff must prove that the parties are living separate and apart without the

plaintiff's fault. (*Graham v. Graham*; Ill. Rev. Stat. 1975, ch. 68, par. 22[1].) Although the plaintiff presented evidence regarding her care of the defendant, the defendant presented evidence to rebut this contention. In light of all the evidence submitted at trial, we find that the conclusion of the trial court that the plaintiff was at fault was not against the manifest weight of the evidence. Therefore, the trial court did not err in dismissing the plaintiff's complaint for separate maintenance.

For the foregoing reasons, that portion of the judgment of the Circuit Court of Cook County dismissing the plaintiff's complaint for separate maintenance is affirmed and that portion of the judgment granting the defendant's counterclaim for annulment is reversed.

Affirmed in part; reversed in part.

McNAMARA and RIZZI, JJ., concur.

---

[1] This statute was repealed by the Illinois Marriage and Dissolution of Marriage Act (Pub. Act No. 80-923, §901, approved September 22, 1977, effective October 1, 1977).